IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| COMSTOCK POTOMAC YARD, L.C., ) <br> ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BALFOUR BEATTY CONSTRUCTION, ) <br> LLC, ) <br> ) <br> ) <br> Defendant. ) | Civil Action No.: 1:08-cv-894 |

## MEMORANDUM OPINION

Plaintiff/Counter Defendant Comstock Potomac Yard, L.C. ("Comstock") and Defendant/Counter Plaintiff Balfour Beatty Construction, LLC ("Balfour Beatty") are parties to a contract governing the construction of a commercial condominium complex. On September 3, 2008, Comstock filed a Complaint against Balfour Beatty after disputes arose over the project. Balfour Beatty responded by asserting its own counterclaim against Comstock, as well as a third party complaint against individual owners who had already bought condominium units. Balfour Beatty included the individual unit owners in the lawsuit because of two mechanic's liens it previously filed. The issue presented herein is whether Balfour Beatty was barred by contract from filing the two mechanic's liens on the project. The Court holds that it was.

### I. FACTS

Comstock, a developer, entered into a $92 million contract ("the Contract") with Centex Construction Co., LLC ("Centex") for the construction of a multi-use condominium project ("the

Project") located in Arlington, Virginia. Balfour Beatty later acquired the rights to the Contract. During the course of performance between Comstock and Balfour Beatty, several disputes arose, and both parties felt entitled to damages.

Additionally, in December of 2007, a subcontractor to Balfour Beatty named Atlas Comfort Systems, USA, LP ("Atlas") filed two mechanic's liens in the amount of approximately $1.4 million against the Project. The Atlas liens significantly hindered Comstock's ability to obtain further financing for the Project. In an attempt to resolve the disputes that had arisen between the parties and to remove the Atlas liens, Comstock and Balfour Beatty entered into a settlement agreement on January 30, 2008 ("the Agreement"). The Agreement did not resolve all issues between the parties, however, as some disputes remained open for further negotiation.

## A. The Agreement

The parties' interactions preceding the execution of the Agreement are useful in illustrating what each party intended to gain from the other. These interactions showed that Balfour Beatty desired, *inter alia*, payment for work it already performed, as well as a promise from Comstock that Comstock had enough funding to pay for obligations that potentially could arise under the Agreement in the future.[1] Comstock, on the other hand, wanted the subcontractor Atlas liens removed from the Project, as well as Balfour Beatty to waive its right to file mechanic's liens on the Project in the future. Additionally, it was the parties' intention to clarify how much work and money were required to complete the Project.

On January 10, 2008, the parties executed a Letter of Intent reflecting some of these intentions. It stated:

---

[1] One such future payment obligation that Balfour Beatty wanted Comstock to reserve money for in case Balfour Beatty became entitled to that money was the payment of the disputed claims left unsettled by the Agreement.

2

It is the intention of the parties to insure by this action:
1. Lien free completion of the Project,
2. Resolve disputed subcontractor amounts listed in the change order log,
3. Certification of the final budget amount by [Balfour Beatty] to complete the project . . .
4. Satisfaction of Lender[2] requirements . . . .
5. Certification by [Comstock] that it will have the funding to complete its obligations under this agreement . . . .

Letter of Intent, January 10, 2008.

Comstock submitted an initial draft of the Agreement to Balfour Beatty on January 16, 2008. Between that date and the date the final Agreement was executed (January 30, 2008), the parties engaged in extensive negotiations. Two topics emphasized during these negotiations were (i) the amount of money that Comstock would reserve for future payment of Balfour Beatty; and (ii) the waiver of Balfour Beatty's right to file a mechanic's lien.

*i. The Reservation of Funds for Payment of Balfour Beatty at a Future Date.*

Balfour Beatty attempted, during negotiations, to bind Comstock to reserving substantial sums of money in Balfour Beatty's name for potential future payments. But Comstock did not want to keep money tied up for extensive periods of time. One set of negotiations on the issue of reserving funds focused on how the parties would handle the agreed-upon payments that Comstock would make to cover the remainder of the Project. Balfour Beatty proposed that this money be placed in an escrow account. Comstock disagreed. In an email to Balfour Beatty, a Comstock employee stated: "no deposit of funds to cover remainder of project." E-mail from Jubal Thompson of Comstock to David Laib of Balfour Beatty and Greg Benson of Comstock (January 16, 2008, 11:56 EST).

After further negotiation, the parties settled on the final contract language, which reads as follows: "[Comstock] warrants that . . . there are sufficient funds available in the loan from

---

[2] The term "Lender" is used by the contracting parties in the Agreement to refer to Corus Bank.

3

[Corus Bank] to timely pay the amounts set forth in paragraph 3."[3] The Agreement, Paragraph 2(f), January 30, 2008. Balfour Beatty now argues that Comstock was required by this provision to continually reserve money in the Corus Bank loan for payment of the remainder of the project.

The parties also negotiated the issue of Comstock reserving money to pay Balfour Beatty in the event that Balfour Beatty prevails on the disputed claims not settled by the Agreement. Specifically, Balfour Beatty sought to have Comstock reserve $1.3 million in either a Corus Bank loan contingency fund or an escrow account for payment of these disputed claims. The following January 24, 2008 contract draft language is Balfour Beatty's attempt to capture this concept (this language was found in Paragraph 5):

a) [Comstock] agrees that it will use good faith efforts to negotiate a resolution of the claims identified in this paragraph, with the goal of completing a resolution by April 15, 2008.
b) [Comstock] and [Corus Bank] warrant that, as of the effective date of this Agreement, there is a balance in the loan "contingency" that is equal to at least $1.3 million, and that at this point this contingency would be available to pay up to that amount in connection with claims described herein.
c) [Comstock] agrees that, if the loan contingency is reduced below that $1.3 million amount, or if it becomes unavailable for use in satisfying the claims under this paragraph, then [Comstock] will promptly notify [Balfour Beatty] of such facts in writing and will then place in escrow, pursuant to an escrow agreement signed by the parties, proceeds from the sales of units or from other sources such that there is an escrow amount of $1.3 million, which is payable upon settlement by the parties of, or a final judgment on, the claims described in this paragraph.

Balfour Beatty Draft of the Agreement, January 24, 2008.

Upon viewing Balfour Beatty's proposed language, Comstock made clear that while it had and would have the $1.3 million available to pay Balfour Beatty if the need arose, it "can't allow cash to be tied up for an indefinite period of time" in an escrow account. As a result, Comstock amended the language of Paragraph 5(c) in hopes of eliminating the "continuity"

---

[3] One "amount" outlined in Paragraph 3 was the amount required to complete the Project.

concept proposed by Balfour Beatty. Comstock also added language in 5(b) that conditioned the release of the $1.3 million contingency fund on the approval of Comstock and Corus Bank.

The final provisions (a), (b), and (c) adopted in Paragraph 5 of the Agreement reflected Comstock's edits:

    a) [Comstock] agrees that it will use its good faith efforts to negotiate with [Balfour Beatty] a resolution of the claims identified in this paragraph by April 15, 2008 ("Informal Negotiations"). Should [Balfour Beatty] and [Comstock] be unable to resolve their claims through Informal Negotiations, the parties shall participate in formal mediation processes . . . by June 15, 2008, provided however, [Comstock] and [Balfour Beatty] agree that the good faith failure to reach resolution through Informal Negotiations and mediation shall not give [Balfour Beatty] the right to lien the Project.
    b) [Comstock] warrants that, as of the effective date of this Agreement, there is a balance in [Corus Bank's] loan "contingency" that is equal to at least $1,300,000 and that at this point this contingency, at the election of [Comstock] and consent of [Corus Bank], would be available to pay up to that amount in connection with claims described herein should the parties be able to resolve their claims through Informal Negotiations, mediation or judicial process.
    c) Notwithstanding the foregoing, [Comstock] agrees that prior to settlement and satisfaction of its claims with [Balfour Beatty] through Informal Negotiations, mediation or judicial process or prior to completion of sales at the Project, [Comstock] shall deposit no less than $1,300,000 in cash or cash equivalents in a segregated Project account for the payment of potential claims.

The Agreement, Paragraph 5(a)-(c), January 30, 2008.

*ii. The Lien Waiver Provisions*

Comstock wanted a clause in the Agreement stating that Balfour Beatty waived its right to file a mechanic's lien. Balfour Beatty, however, repeatedly insisted on adding qualifications or conditions precedent to any lien waiver language. For example, in the January 24, 2008 draft, Balfour Beatty suggested the following conditional lien waiver provision: "[Balfour Beatty] agrees it will not at any time file or record a lien against the Project unless it is not timely or fully paid hereunder or unless the claim in Paragraph 5 is not timely resolved."

5

Comstock rejected this, as well as all other Balfour Beatty attempts to qualify lien waiver provisions. Balfour Beatty eventually acquiesced, and the final contract language adopted embodies Comstock's position. Paragraph 6(b) states, "[Balfour Beatty] agrees that it will not at any time file or record a lien against the Project." Paragraph 1 states, "[t]his Agreement fully supercedes the [Letter of Intent] and is intended to ensure lien-free completion of the Project . . ." Paragraph 5(a) represents that "[Comstock] and [Balfour Beatty] agree that the good faith failure to reach resolution through Informal Negotiations and mediation shall not give [Balfour Beatty] the right to lien the Project." Finally, Paragraph 5 states that "[Balfour Beatty] irrevocably waives its right to a mechanics [sic] lien for these disputed amounts . . . ."[4]

*iii. Other Provisions in the Final Agreement*

The Final Agreement contains additional provisions besides those explained above. Some of these provisions codify the parties' intentions that were expressed during the negotiation process. For example, Paragraph 1 states that "This Agreement . . . is intended to . . . resolve the outstanding Change Orders relating to subcontractors used on the Project, certify a final budget by [Balfour Beatty] for [Comstock] and [Corus Bank's] benefit, and certify as set forth herein that Owner has funding through [Corus Bank] to pay for completion of the Project." Paragraph 2, titled "Lien-Free Completion of the Project," addresses permanently removing and preventing the further filing of subcontractor mechanic's liens, such as the Atlas liens.

Paragraph 3 contains the settlement provision whereby Comstock agreed to pay Balfour Beatty $1,172,500 for the resolution of disputed claims involving change orders. Comstock bound itself to pay this amount of $1,172,500 even though it feels it is entitled to much more

---

[4] The "disputed amounts" term refers to money that Balfour Beatty feels it is owed under the remaining disputed claims not resolved by the Agreement.

6

than that sum as a result of Balfour Beatty's breaches in other areas of the Contract.[5] Paragraph 3 also contains the parties' agreement as to the amount in retention/retainage that Comstock would owe Balfour Beatty in the future.[6] The parties further agreed in Paragraph 3 that Comstock promised to pay Balfour Beatty a total sum of $2,272,500, which included the settlement amount, the retention amount, and an amount necessary to remove the Atlas liens from the Project. Paragraph 3 clarified that this payment of $2,272,500 did not cover any of the claims left unresolved by the Agreement, and that the unresolved claims were addressed in Paragraph 5. Paragraph 4 provided a payment schedule for the settlement and retention amounts contained in Paragraph 3.

## B. The Dispute

On the date the Agreement was signed (January 30, 2008), Comstock represented that it had more than $1.3 million available in the Corus Bank contingency fund to pay the unresolved disputed claims if the need arose. Balfour Beatty later became concerned that Comstock would be unable to pay off these claims, however, after Comstock refinanced the Corus Bank loan with Key Bank. The new Key Bank loan did not contain a $1.3 million contingency fund specifically designated for Balfour Beatty. This refinancing also raised fears with Balfour Beatty that Comstock would not be able to make the retention payments when they came due. Balfour Beatty's concern about getting paid heightened after mediation attempts to resolve the remaining disputed claims failed. As a result, on July 29, 2008, Balfour Beatty filed two mechanic's liens on the Project. A Balfour Beatty official stated that the liens were filed because

---

[5] Comstock feels it is owed over $8 million in liquidated damages as a result of Balfour Beatty's breaches of the Contract. This dispute over the liquidated damages issue, however, was not resolved by the Agreement.

[6] Retention and retainage represent the concept that a portion of a contract's final payment is withheld by the owner until the project is complete in all respects.

"at that point in time, we were quite certain that we had no opportunity to amicably resolve our differences as the mediation efforts had failed." Transcript of February 17, 2009 Evidentiary Hearing at 158. One lien, in the amount of $330,610, is for "retainage on adjusted contract amounts not subject to prior liens." The second lien, in the amount of $221,566 is for "extended delay costs on adjusted contract amounts not subject to prior liens."

In September 2008, Comstock filed the instant lawsuit against Balfour Beatty alleging breach of contract, slander of title, and abuse of process. On October 14, 2008, Balfour Beatty answered Comstock's Complaint and filed its own Counterclaim asserting claims of breach of contract, breach of contract/specific performance, changes to the contract, breach of implied duty not to hinder or delay contract performance, and enforcement of the mechanic's liens. On October 28, 2008, in an attempt to comply with the Virginia lien statute (Va. Code § 43), Balfour Beatty filed a Third Party Complaint to join all owners, lenders, and trustees to its enforcement action. The parties agreed to and requested an expedited hearing to develop the facts behind and determine the validity of Balfour Beatty's mechanic's liens. This hearing was held on February 17, 2009. Post-hearing briefing was completed on March 11, 2009.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between corporations of different states. Furthermore, venue is proper in this case under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in the Eastern District of Virginia.

## III. THE EVIDENTIARY HEARING

Because of the Agreement's Virginia choice of law provision, this matter is governed by Virginia law. *See* The Agreement, Paragraph 11, January 30, 2008. Virginia Code § 43-17.1 permits any party having an interest in real property against which a lien has been filed to petition the court to hold a hearing to determine the validity of that lien. Citing this provision, Comstock moved the Court on November 26, 2008 to conduct an evidentiary hearing on the validity of the two mechanic's liens filed by Balfour Beatty. Comstock filed its motion because, while it felt the Agreement was clear on its face, Balfour Beatty had argued that some terms were ambiguous. Comstock also wanted to accelerate the Court's determination of the validity of the Agreement, one of several disputes between the parties in this suit. The Court, however, denied Comstock's motion to bifurcate the trial on the lien validity issue. But after the Court's ruling, Balfour Beatty took the position that it, too, wanted to resolve the lien validity issue through an evidentiary hearing. The parties then approached the Court together and asked it to reconsider having the hearing. The Court obliged, conducting the evidentiary hearing on February 17, 2009.

The Court asked the parties to address two main issues at the hearing: (1) whether the lien waiver provisions of the Agreement barred Balfour Beatty from filing the mechanic's liens; and (2) whether the mechanic's liens were over inclusive.[7] At the hearing, the Court was presented with evidentiary exhibits and testimony on both of these issues. The Court's decision on the

---

[7] Most published cases involving Virginia Code § 43-17.1 hearings involve issues of whether mechanic's liens comport with the Virginia lien statute. Whether Balfour Beatty's mechanic's liens were over inclusive is an issue of this nature. The other issue examined at the evidentiary hearing, however, is different. Under this issue, the Court heard evidence on whether a *contract* barred a party from filing a lien because of a lien waiver provision. The Virginia Supreme Court has condoned the practice of lower courts addressing contractual lien waiver provisions in § 43-17.1 hearings and ruling on the issue after the hearing. *See McMerit Construction Company v. Knightsbridge Development Co., Inc.*, 235 Va. 368 (1988). Therefore, the Court believes that it appropriately addressed the lien waiver issue at the evidentiary hearing stage and can rule on this issue at this point in time.

9

contractual lien waiver issue is dispositive, however. Therefore, it will not address the issue of whether the mechanic's liens were over inclusive in this Memorandum Opinion.

Regarding the contractual lien waiver issue, the parties offered evidence revealing their intentions in entering into the Agreement. The parties also presented evidence pertaining to whether Comstock breached the Agreement before Balfour Beatty filed its mechanic's lien. The Court's interpretations of the Agreement and attendant justifications are provided below.[8] Additionally, the Court shall make factual findings on the issue of whether Comstock breached the Agreement before Balfour Beatty filed its liens.[9]

## IV. ANALYSIS

As mentioned above, the issue presented herein is whether Balfour Beatty was barred by the Agreement from filing the two mechanic's liens on the Project. If any of the following three statements are accurate, Balfour Beatty was not barred from filing the liens when it did: (1) the Agreement is not supported by valid consideration; (2) the lien waiver provisions are subject to a conditional precedent that had not yet triggered at the time the liens were filed; or (3) Comstock breached the Agreement before Balfour Beatty filed its liens. For the reasons set forth below, none of these statements have support. Therefore, Balfour Beatty was bound by the lien waiver provisions in the Agreement and barred by that Agreement from filing the two mechanic's liens against the Project.

---

[8] Contract interpretation is a matter of law. *Federal Ins. Co. v. New Coal Co., Inc.*, 415 F.Supp.2d 647, 656 (W.D. Va. 2006) (citing *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n,* 831 F.2d 1238, 1242 (4th Cir.1987).

[9] The party asserting the breach of contract claim must prove that claim by a preponderance of the evidence. *See Carley Capital Group v. City of Newport News*, 709 F.Supp. 1387, 1396 (E.D. Va. 1989); *Danielson v. Thoburn Ltd. P'ship*, 2005 WL 3476683 at *1 (Va. Cir. Ct. 2005).

*Issue 1: Whether the Agreement was supported by valid consideration*

Balfour Beatty argues that it was not barred by the Agreement from filing the mechanic's liens because the Agreement, and thus the lien waiver language, is invalid on the grounds that Comstock failed to provide bargained-for consideration. The Court disagrees. "[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." RESTATEMENT (SECOND) OF CONTRACTS § 17; *see e.g., Audio Visual Assocs., Inc. v. Sharp Elec. Corp.*, 210 F.3d 254, 258 (4th Cir. 2000). Furthermore, "a promise which is bargained for is consideration if, but only if, the promised performance would be consideration." RESTATEMENT (SECOND) OF CONTRACTS § 75.

Here, the Agreement contained a number of promises from Comstock. For example, Comstock promised to pay Balfour Beatty $1,712,500 to settle some of the disputed claims between the parties, even though Comstock believed that other disputed claims not resolved by the Agreement gave it the right to recover over $8 million in liquidated damages from Balfour Beatty. Comstock also promised Balfour Beatty that it would negotiate in good faith on the unresolved disputed claims; that it had $1.3 million available in a contingency fund on the date the Agreement was signed (January 30, 2008); and that it would establish a segregated escrow account of $1.3 million prior to resolution of the remaining disputed claims or completion of sales at the Project. In return for these promises, Balfour Beatty agreed to waive its right to file mechanic's liens.[10] Because of these promises exchanged between the parties, the Agreement is a valid, bargained-for contract with consideration. *See* RESTATEMENT (SECOND) OF CONTRACTS

---

[10] The Virginia Code specifically provides that any right to file or enforce a mechanic's lien "may be waived in whole or in part at any time by any person entitled to such lien." Va. Code Ann. § 43(C) (2004); *see also First Bank of Virginia v. J.S.C. Concrete Constr., Inc.*, 259 Va. 60, 68 (2000). Such a lien waiver must be supported by consideration, however. *United Masonry Inc. of Virginia v. Riggs Nat'l Bank of Washington, D.C.*, 233 Va. 476, 483 (1987).

§ 17, 75. Therefore, Balfour Beatty's contractual obligation prohibiting it from filing a mechanic's lien cannot be excused on lack-of-consideration grounds.

Balfour Beatty argues that the promise to pay $1,712,500 does not constitute consideration because Comstock was already obligated to pay that sum to Balfour Beatty for past work performed. This argument fails, however, because before the Agreement was signed on January 30, 2008, Balfour Beatty was not guaranteed to collect that amount of money from Comstock. Indeed, the money that Balfour Beatty felt it was owed was linked to one of many disputed claims between the parties during an uncertain and litigious time. Had Comstock prevailed in litigation and earned the right to collect damages from Balfour Beatty, that $1,712,500 could have been set off against those damages. Thus, that Balfour Beatty was able to corral $1,712,500 from Comstock under these uncertain litigious circumstances contributes to the consideration of the Agreement.

*Issue 2: Whether the Lien Waiver Provisions Were Conditional*

Balfour Beatty next argues that it was not barred by the Agreement from filing mechanic's liens because the lien waiver provisions of the Agreement were subject to conditions precedent that had not triggered by the date the liens were filed. The Court disagrees with Balfour Beatty's position. The evidence presented at the hearing shows that Balfour Beatty ardently sought to condition its lien waiver on some type of performance by Comstock. For example, Balfour Beatty included the following language in its January 24, 2008 contract draft proposal: "[Balfour Beatty] agrees it will not at any time file or record a lien against the Project unless it is not timely or fully paid hereunder or unless the claim in Paragraph 5 is not timely resolved." Comstock rejected this proposal, however, by eliminating the conditional language, and rejected all of Balfour Beatty's other attempts to qualify the lien waiver provision. Balfour

Beatty eventually acquiesced, and the final contract language reflected Comstock's intent that the lien waiver provisions be unconditional.

To be sure, none of the final lien waiver clauses in the Agreement are subject to qualifying or limiting language such as "if," "provided that," "so long as" or "unless." Most notably, Paragraph 6(b) of the Agreement clearly and firmly states that "[Balfour Beatty] will not at any time file or record a lien against the Project." Paragraph 5 states that [Balfour Beatty] irrevocably waives its right to a mechanic's lien for these disputed amounts . . . ."[11] Paragraph 5(a) represents that "[Comstock] and [Balfour Beatty] agree that the good faith failure to reach resolution through Informal Negotiations and mediation shall not give [Balfour Beatty] the right to lien the Project." In sum, the evidence presented at the hearing, as well as the plain and unambiguous language of the contract itself, both support the conclusion that the lien waiver provisions in the Agreement are unconditional. Therefore, Balfour Beatty's contractual obligation prohibiting it from filing a mechanic's lien cannot be excused on the grounds that the lien waiver language was subject to a condition that had not triggered before the liens were filed.

*Issue 3: Whether Comstock breached the Agreement before Balfour Beatty filed its liens.*

Balfour Beatty next argues that it was not barred by the Agreement from filing mechanic's liens because Comstock breached the Agreement before the liens were filed. *See Countryside Orthopaedics v. Peyton*, 261 Va. 142, 154 (2001) ("[g]enerally, a party who commits the first breach of a contract is not entitled to enforce the contract"). Specifically, Balfour Beatty alleges that Comstock breached the Agreement by (1) refinancing the Corus loan with Key Bank; (2) by not having $1.3 million available to pay for the remaining disputed claims on January 30, 2008; (3) by not putting $1.3 million into an escrow account; and (4) by not

---

[11] As mentioned above, the "disputed amounts" term refers to money that Balfour Beatty feels it is owed under the remaining disputed claims not resolved by the Agreement.

13

negotiating in good faith. We find that Comstock did not commit any of these breaches, nor did it breach the Agreement in any other manner before Balfour Beatty filed its liens.

First, Balfour Beatty asserts that Comstock had a continuing obligation under the Agreement to keep funds available in the Corus Bank loan to pay Balfour Beatty, and that Comstock breached that obligation by refinancing the Corus Bank loan with Key Bank. Balfour Beatty was troubled by the refinancing because the Corus Bank loan had a specific contingency fund with line items designating money for payment of Balfour Beatty. The Key Bank loan, however, contained no such line items.

In support of its claim that the refinancing constituted a breach of the Agreement, Balfour Beatty cites Paragraphs 2(f) and 5(b). Paragraph 2(f) states: "[Comstock] warrants that . . . there are sufficient funds available in the loan from [Corus Bank] to timely pay the amounts set forth in paragraph 3 . . . ."[12] Paragraph 5(b) relates to the potential payment of the disputed claims not settled by the Agreement, and states:

> [Comstock] warrants that, as of the effective date of this Agreement, there is a balance in [Corus Bank's] loan "contingency" that is equal to at least $1,300,000 and that at this point this contingency, at the election of [Comstock] and consent of Lender, would be available to pay up to that amount in connection with claims described herein should the parties be able to resolve their claims through Informal Negotiations, mediation or judicial process.

The Agreement, Paragraph 5(b), January 30, 2008.

Balfour Beatty presented testimony at the hearing in an attempt to further build its "continuing obligation" argument. Specifically, David Laib of Balfour Beatty testified that "the basic premise of this agreement . . . was that there would be sufficient funds available to

---

[12] As mentioned above, some of the "amounts" contained in Paragraph 3 involve the money Comstock promised to pay Balfour Beatty to settle the disputed claims, as well as the agreed-to amount necessary to pay for the completion of the Project.

14

complete the project, to pay us over time" and that "there was a continuing payment obligation." Transcript of February 17, 2009 Evidentiary Hearing at 137.

Comstock responded by arguing that Paragraphs 2(f) and 5(b) should be interpreted as a "snapshot in time" requiring Comstock to have necessary funding in the Corus Bank loan on the date the Agreement was signed (January 30, 2008) to fulfill its contractual payment obligations. Regarding 2(f), Jubal Thompson of Comstock argued that "I don't believe the warranty in 2(f) was meant to be a continuing warranty... it was a snapshot warranty that was going to be as to the effective date of the agreement.... I couldn't allow a contingent liability claim to control our refinance of the project." Transcript of February 17, 2009 Evidentiary Hearing at 112-113. Mr. Thompson expressed a similar view in his interpretation of Paragraph 5(b), as he explained:

> My understanding was that at the snapshot in time that we would offer up on the day that we executed the agreement, that there was up to $1.3 million in the hard cost loan contingency with Corus Bank.... And I specifically had conversations with David Laib ... that we couldn't make promises [about the future] because we couldn't control the lender."

Transcript of February 17, 2009 Evidentiary Hearing at 85-86.

The Court believes that the plain language of Paragraphs 2(f) and 5(b) comports with Comstock's "snapshot" interpretation. Indeed, 2(f) promises that "there *are* sufficient funds available in the loan from [Corus Bank] to pay the amounts set forth in Paragraph 3 below to [Balfour Beatty]." The Agreement, Paragraph 2(f), January 30, 2008 (emphasis added). This clause uses the present tense, not the future tense, when addressing the issue of available funds. The clause does not say "there are *and will continue to be* sufficient funds available in the loan from [Corus Bank] to pay the amounts set forth in Paragraph 3 below to [Balfour Beatty]."

Paragraph 5(b) states that "Owner warrants that, *as of the date of this Agreement*, there *is* a balance in the [Corus Bank] 'contingency' ... that *at this point ... would be available* to pay .

..." The Agreement, Paragraph 5(b), January 30, 2008 (emphasis added). The language does not say, "there is *and will continue to be* a balance in the [Corus Bank] 'contingency' that would be available to pay." Through the use of the present tense, the language in 2(f) and 5(b) reflects an "at this moment in time" attitude and not one of future and continuing obligation. Thus, a plain language reading of both 2(f) and 5(b) supports the Comstock "snapshot" interpretation. Under this interpretation, Comstock breached the Agreement if it was unable to fulfill its payment obligations under the Agreement on the date the Agreement was signed. The facts identified in the pleadings, memoranda, and evidentiary hearing do not persuade the Court that Comstock was unable meet these payment obligations on January 30, 2008 through the Corus Bank loan.

Finally, the Agreement contained no prohibition against refinancing the Corus Bank loan. Balfour Beatty knew or should have known that before it signed the Agreement that refinancing could be an issue in the near future because Comstock provided Balfour Beatty with a proposed loan modification on January 25, 2008 stating that the Corus loan was set to expire in July of 2008. Despite this warning, Balfour Beatty chose to sign a contract (i.e. the Agreement) that was silent on the issue of refinancing the Corus Bank loan.

In sum, because of the lack of any provision in the Agreement addressing refinancing, and since nothing persuades the Court that Comstock was unable meet its payment obligations under the Agreement on January 30, 2008, the Court holds that Comstock did not breach the Agreement by refinancing the Corus Bank loan.[13]

Regarding the second alleged breach, Balfour Beatty asserts that Comstock breached the Agreement by not having the $1.3 million available in the Corus Bank contingency fund to pay

---

[13] Additionally, even though the Key Bank loan does not designate funds for payment of Balfour Beatty in the same manner that the Corus Bank loan did, Comstock has represented that it has the ability to obtain the necessary funds to meet all of its payment obligations to Balfour Beatty under the Agreement.

for the remaining disputed claims on January 30, 2008, as required by Paragraph 5(b). Specifically, Balfour Beatty alleges that while Comstock represented in a sworn statement that it had more than $1.3 million available in this fund on the date the Agreement was signed, Comstock had actually committed over $133,000 from that fund to pay a loan modification fee due Corus. Balfour Beatty asserts that removing this modification fee from the contingency fund would cause the balance of that line item to drop below $1.3 million. The Court rejects this argument, however, because on January 30, 2008, Comstock had approximately $2.5 million in the contingency fund.[14] On February 4, 2008, the contingency fund contained $1,378,055. Therefore, Comstock did not breach Paragraph 5(b) by having too little money available in the contingency fund on the date the Agreement was signed.[15]

Third, Balfour Beatty argues that Comstock breached Paragraph 5(c) of the Agreement because it failed to put $1.3 million into a segregated account (i.e., an escrow account). Balfour Beatty asserts that Comstock was required to put the $1.3 million into the segregated account the instant that money became unavailable through the Corus Bank loan. This occurred, according to Balfour Beatty, when Comstock refinanced. When asked about Paragraph 5(c), Mr. Laib stated that "5(c) provides for [Comstock] to provide a segregated account or an escrow account in the . . . amount of $1.3 million . . . . The essence here is that there would always be a security for our disputed amounts." Transcript of February 17, 2009 Evidentiary Hearing at 141. Mr. Thompson of Comstock, on the other hand, argues that Comstock was only obliged under the Agreement to give Balfour Beatty the $1.3 million cash escrow "prior to completion of the

---

[14] The settlement amount, $1,172,500, remained in the contingency fund until February 25, 2008.
[15] Worth noting is that at the time Comstock executed the Agreement, it was not bound by any contract to pay the loan modification fee from the Corus Bank contingency fund. The draft loan modification agreement clearly indicated that the fee "*may* be paid from [Comstock's] hard cost contingency account." *Second Amendment and Modification to Construction Loan Agreement and Other Loan Documents*, (Exhibit 38) (emphasis added). Therefore, Comstock had the option to pay the fee out of the Corus loan, or use other means. For these reasons, Comstock made no misrepresentations regarding about how the loan modification fee would apply.

project or prior to an adjudication or informal mediation or judicial or to a formal mediation." Transcript of February 17, 2009 Evidentiary Hearing at 84. The Court agrees with Comstock's argument. As mentioned above, Paragraph 5(c) states:

> [Comstock] agrees that prior to settlement and satisfaction of its claims with [Balfour Beatty] through Informal Negotiations, mediation or judicial process or prior to completion of sales at the Project, [Comstock] shall deposit no less than $1,300,000 in cash or cash equivalents in a segregated Project account for the payment of potential claims.

The Agreement, Paragraph 5(c), January 30, 2008. The Court interprets this clause as plainly and unambiguously requiring Comstock to put $1.3 million into an escrow account before either: (1) the parties sign settlement papers regarding the resolution of the remaining disputed claims, or (2) all of the condominium units are sold. Neither of these two events occurred before Balfour Beatty filed its mechanic's liens on July 29, 2008. Therefore, Comstock was not obligated under Paragraph 5(c) to place $1.3 million into escrow by that date. As a result, the Court concludes that Comstock did not breach Paragraph 5(c) before Balfour Beatty filed the liens.

Fourth, Balfour Beatty argues that Comstock breached Paragraph 5(a) because it failed to negotiate in good faith over the remaining disputed claims not resolved by the Agreement. The Court disagrees. Balfour Beatty asserts that it took extensive efforts to make settlement progress with Comstock after the January 2008 Agreement but was repeatedly rebuffed. This does not, however, constitute a failure to negotiate in good faith. A promise to negotiate in good faith is not a promise to settle, but rather a promise to *try in good faith* to settle. The Court finds nothing in the record to support a conclusion that Comstock failed to negotiate in good faith. Therefore, the Court concludes that Comstock did not breach the "good faith" provision in Paragraph 5(a).

For the foregoing reasons, the Court rules that Comstock did not breach the Agreement before Balfour Beatty filed its mechanics' liens.

## V. CONCLUSION

In sum, the Court finds that the Agreement is supported by consideration, that the lien waiver provisions in the Agreement are unconditional, and that Comstock did not breach the Agreement before Balfour Beatty filed the liens. Therefore, the Court holds that the two mechanic's liens filed on the Project by Balfour Beatty are invalid because they were barred by the lien waiver provisions. As a result, the Court shall grant judgment in favor of Comstock and Third Party Defendants on this issue.

Entered this 20th day of April, 2009.

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge