

| | | |
|---|---|---|
| COMSTOCK POTOMAC YARD, L.C., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:08-cv-894 |
| | ) | |
| BALFOUR BEATTY CONSTRUCTION, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION

Plaintiff/Counter-Defendant Comstock Potomac Yard, L.C. ("Comstock") and

Defendant/Counter-Plaintiff Balfour Beatty Construction, LLC ("Balfour Beatty") are parties to

a contract governing the construction of a commercial condominium complex. After disputes

over this project arose, Comstock filed a complaint against Balfour Beatty. Balfour Beatty

responded by asserting its own counterclaim against Comstock. Both parties now move for

partial summary judgment on the other's claims. For the following reasons, Comstock's motion

will be granted in part and denied in part. Balfour Beatty's motion will also be granted in part

and denied in part.

## I. BACKGROUND

On or about November 12, 2004, Comstock, a developer, entered into a $92 million

contract ("the General Conditions Contract") with Centex Construction Co., LLC for the

construction of a multi-use condominium complex ("the Project") located in Arlington, Virginia.

Balfour Beatty later acquired the rights to this General Conditions Contract.

Under the contract, Balfour Beatty was required to achieve "Substantial Completion" by a specific date. Substantial Completion occurs when

> (i)    construction is complete, in accordance with the Contract Documents, so that [Comstock] can lawfully occupy or use the Work (or a designated portion thereof for the use for which it is intended),
>
> (ii)    all remaining punch list items can be reasonably and ordinarily expected to be completed within thirty (30) days, and
>
> (iii)    A Temporary Certificate of Occupancy ("TCO") for the portion of the Work required to achieve Substantial Performance as set forth in the Contract Documents, including the Project Schedule, has been issued by Arlington County . . . . , and
>
> (iv)    90% of individual condominium units and all associated common areas within each milestone are complete for turnover/delivery to unit owners.

*General Conditions Contract*, § 8.1.3.

The Substantial Completion date (*i.e.*, the date when the above elements are met), is a heavily contested issue between the parties. The contract requires Balfour Beatty, when it feels it has attained Substantial Completion, to submit a "punchlist" of remaining items that must be completed prior to final payment. *General Conditions Contract*, § 9.8.2.

During the course of performance between Comstock and Balfour Beatty, several disputes arose, and each party felt entitled to damages. Many of the disputed issues revolve around delays which have prevented the Project's full completion. Furthermore, in December of 2007, a subcontractor to Balfour Beatty named Atlas Comfort Systems, USA, LP ("Atlas") filed two mechanic's liens in the amount of approximately $1.4 million against the Project. The parties now dispute whether it was Balfour Beatty's obligation to effectuate removal of the liens by paying Atlas for the work performed. According to Comstock, the Atlas liens significantly hindered its ability to obtain additional financing for the Project.

In an attempt to resolve some of the disputes that had arisen between the parties, and with the intention of removing the Atlas liens from the Project, Comstock and Balfour Beatty entered into a settlement agreement on January 30, 2008 called the Lien-Free Completion Agreement ("the Agreement"). This Agreement, however, left some disputed issues open for further negotiation.

As part of the Agreement, Balfour Beatty agreed that it would "not at any time file or record a lien against the Project." Balfour Beatty, however, after it formed a belief that Comstock breached the new deal, filed two mechanic's liens against the Project. Balfour Beatty filed these liens against anyone owning an interest in the Project, such as individual condominium unit owners, lenders, and trustees, thinking that this act was compelled by the Virginia lien statute (Va. Code. § 43).

After the lien filings, Comstock initiated the instant lawsuit against Balfour Beatty, alleging breach of contract (Count I), slander of title (Count II), and abuse of process (Count III). Balfour Beatty responded by filing its own counterclaim asserting claims of breach of contract (Counterclaim Count I), breach of contract/specific performance (Counterclaim Count II), changes to the contract (Counterclaim Count III), breach of implied duty not to hinder or delay contract performance (Counterclaim Count IV), and enforcement of the mechanic's liens (Counterclaim Count V). Additionally, Balfour Beatty filed a third party complaint to join all owners, lenders, and trustees named in the mechanic's lien filings in the present action (Third Party Complaint Count I). As a result, hundreds of parties were joined in this lawsuit.

The parties consented to and requested an expedited evidentiary hearing to determine the validity of Balfour Beatty's mechanic's liens. This hearing was held on February 17, 2009. The Court then issued an Order and Memorandum Opinion finding that (1) the Lien-Free Completion

Agreement was supported by consideration; (2) the lien waiver provisions in the Agreement were unconditional; (3) Comstock did not breach the Agreement before Balfour Beatty filed the liens; and (4) the liens were invalid. Because the Court invalidated those liens, the claims related to the liens (*i.e.*, Counterclaim Count V and Third Party Complaint Count I) were dismissed with prejudice, which resulted in the termination of the hundreds of Third Party Defendants as parties. On July 7, 2009, Balfour Beatty moved for partial summary judgment regarding Comstock's complaint, and Comstock moved for partial summary judgment on Balfour Beatty's counterclaims.

Both parties raise numerous issues in their briefs, believing that each warrants summary judgment. However, the Court is of the view that most of these issues involve disputes of material fact and must proceed to trial. This Memorandum Opinion addresses the select few issues that the Court believes are ripe for judgment at this stage.

These issues are as follows:

(1) Whether Comstock's slander of title claim must be dismissed.

(2) Whether Comstock's abuse of process claim must be dismissed.

(3) Whether Comstock is entitled to attorney's fees for the expenses it incurred in litigating issues related to the two mechanic's liens filed by Balfour Beatty.

(4) Whether Balfour Beatty breached the Lien-Free Completion Agreement by filing the two mechanic's liens on the Project.

(5) Whether Balfour Beatty is limited at trial to relying on only the six primary delay claims presented in the Dr. Harmon expert report.

## II. JURISDICTION, VENUE, AND CHOICE OF LAW

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between corporations of different states. Venue is proper in this case under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in the Eastern District of Virginia. Additionally, the parties do not dispute that Virginia law applies.[1]

## III. STANDARD OF REVIEW

Summary judgment should be granted where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). As the Supreme Court has explained, a fact is "'material' only if it might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. v. Zenith Radio, 475 U.S. 574, 587-88 (1986).

---

[1] It is worth noting that ¶ 11 of the Lien-Free Completion Agreement contains a Virginia choice of law provision. Furthermore, § 4.6.1 of the General Conditions Contract contains a choice of forum provision stating that "it is understood and agreed that the sole and exclusive judicial forum for the resolution of the Claim shall be the Circuit Court for Arlington, Virginia or the Federal District Court for the Eastern District of Virginia."

Additionally, see Fuisz v. Selective Ins. Co. of America, 61 F.3d 238, 241 (4th Cir. 1995), which states: "[W]e must resolve this diversity action pursuant to Virginia law because the case was filed in federal court in the Eastern District of Virginia. Nguyen v. CNA Corp., 44 F.3d 234, 237 (4th Cir.1995). Virginia adheres to traditional choice of law rules; with respect to contract actions like this one, the place of contracting governs the substantive issues of the case. Frye v. Commonwealth, 231 Va. 370, 345 S.E.2d 267, 272 (1986)".

# IV. ANALYSIS

## A. Whether Comstock's Slander of Title Claim Must be Dismissed.

### i. The Donohoe Analysis

Comstock argues that Balfour Beatty committed slander of title by filing two mechanic's liens on the Project while knowing that it previously waived its rights to file these liens in the Lien-Free Completion Agreement. Balfour Beatty, on the other hand, argues that the filing of a mechanic's lien constitutes a "judicial proceeding" that is entitled to the defense of absolute privilege.

The Virginia Supreme Court, in *Donohoe Constr. Co. v. Mount Vernon Assocs.*, 235 Va. 531 (Va. 1988), addressed the issue of whether a memorandum of a mechanic's lien is entitled to absolute judicial privilege in a slander of title suit. In *Donohoe,* a developer and a builder entered into a contract for the purpose of constructing a nursing home facility. *Id.* at 534. Construction progressed slowly, and a dispute arose between the developer and the builder over who was responsible for paying certain fees. *Id.* When it was suggested that the parties use the contract to resolve their differences, the builder "stated that he did not care what the contract provided and unless the issue was resolved in [his] favor, [he] 'would have . . . difficulty delivering the [nursing home].'" *Id.*

Delays continued, as the builder refused to accelerate his pace of work. *Id.* For example, when the builder was asked, "why don't you get a crew out here and finish this building?", the builder replied "I've got 17 projects going. This is the least profitable. Unless you concede on these items in controversy . . . I cannot motivate my people to get out there and finish your building." *Id.* at 534-35. While construction on the nursing home facility was eventually completed, the builder faced liquidated damages for the project delays. *Id.* at 534.

Perhaps as a litigation tactic, the builder filed a memorandum of mechanic's lien on the nursing home facility. *Id.* at 535-36. In the accompanying suit to enforce the lien, the court concluded that the lien was invalid. *Id.* at 536. The developer then filed a complaint against the builder, alleging that the builder (1) slandered the developer's title and (2) abused the judicial process by filing the invalid lien. *Id.*

The builder responded to the slander claim by arguing that filing a memorandum of mechanic's lien constitutes a judicial proceeding that is entitled to absolute privilege. *Id.* at 537. The Supreme Court of Virginia agreed, stating that "we conclude that the filing of the memorandum of mechanic's lien constitutes a judicial proceeding. As previously noted, it is a prerequisite to a suit to enforce. For a claimant to obtain the remedy provided by statute, he must *perfect* his lien and, thereafter, sue to *enforce* it. The two proceedings are inseparable." *Id.* at 538-39 (internal citations omitted). But the court also explained that "[t]he inquiry does not end with our finding that the perfection of a lien constitutes a judicial proceeding. To be entitled to an absolute privilege, the words employed must be relevant and pertinent to the case. We have adopted a liberal rule in determining the degree of relevancy or pertinency necessary to bring a matter within the privilege." *Id.* at 539.

The court then found that the statements in the memorandum of mechanic's lien were relevant and held that "the filing of a mechanic's lien is a judicial proceeding entitling [the builder] to an absolute privilege against [the developer's] slander of title claim." *Id.* at 541. As a result, the court explained, the trial court erred in refusing to strike the developer's slander of title count. *Id.* at 539, 541.

Some courts interpreting *Donohoe*, including the Virginia Supreme Court itself, have chosen to apply the case narrowly, explaining that it is the filing of the memorandum of lien *in*

*combination with* the suit to enforce that constitutes the single judicial proceeding. *See Lockheed Info. Mgmt. Sys. Co., Inc., et al. v. Maximus, Inc.*, 259 Va. 92, 102 (Va. 2000) ("*Donohoe* was a mechanic's lien case in which the Court concluded that, because filing the mechanic's lien affidavit to perfect the lien is a prerequisite to filing suit to enforce the lien, the filing of the lien and the suit to enforce the lien were inseparable. Therefore, because the filing of the memorandum of lien affidavit and the suit to enforce the lien constituted a single judicial proceeding, the contents of the affidavit were entitled to an absolute privilege. The doctrine of absolute privilege was not extended to the mere execution of any affidavit.") (internal citations omitted); *In re Concrete Structures, Inc.*, 261 B.R. 627, 633 (E.D.Va. 2001) ("*Lockheed* explains that *both* the filing of the memorandum *and* the suit to enforce the lien constitute a judicial act or judicial proceeding, not that the mere filing of the memorandum is a judicial proceeding. That interpretation of *Donohoe* is fully consistent with earlier decisions of the Supreme Court of Virginia to the effect that the filing of a memorandum is not a proceeding at all."). Under these interpretations of *Donohoe*, it would seem that the mere filing of a memorandum of lien without a subsequent suit to enforce would not qualify as a judicial proceeding.[2]

Importantly, even under the narrow interpretations of *Donohoe* outlined above, Balfour Beatty is entitled to absolute privilege from a slander claim in filing its liens. Under these narrow interpretations, the filing of a lien combined with the suit to enforce it constitutes a single judicial proceeding worthy of absolute privilege. Here, Balfour Beatty filed a memorandum of mechanic's lien and then instituted a suit to enforce that lien through its filing of Counterclaim

---

[2] It is worth noting that while the facts of *Donohoe* are very similar to the facts of the present case (*i.e.*, a slander of title claim in a construction case where a lien was filed), *In re Concrete Structures* and *Lockheed* are not as factually analogous. The principal issue in *In re Concrete Structure* was whether the filing of a Virginia mechanic's lien constituted a "judicial lien" within the meaning of the United States Bankruptcy Code. The issue addressed in *Lockeed* did not involve a mechanic's lien at all, and instead concerned whether statements made during an administrative hearing were entitled to absolute privilege.

Count V and Third Party Complaint Count I. Because Balfour Beatty is entitled to absolute judicial privilege for the filing of its liens, Comstock's slander claim shall be dismissed.

Comstock argues that its slander claim is distinguishable from the slander claim in *Donohoe* because Comstock's claim does not arise from misstatements contained in Balfour Beatty's lien memoranda. Instead, Comstock argues, its slander claim arises from the *act* of Balfour Beatty filing the lien. After analyzing the Virginia case law on this issue, the Court cannot conclude that the mere act of filing a mechanic's lien is slanderous. Thus, the Court finds that Comstock's argument is without merit.

### ii. Whether Balfour Beatty Waived its Judicial Privilege by Entering into the Waiver Provisions of the Lien-Free Completion Agreement

Comstock argues that because Balfour Beatty waived its right to file a mechanic's lien in the Lien-Free Completion Agreement, it also waived additional privileges and immunities related to that lien waiver, such as the absolute privilege in judicial proceedings. Clearly, a party's waiver of one right does not automatically constitute waiver of *all* other available rights. However, courts commonly have held that a party's actions, especially in contracting, can result in the waiver of *some* related rights. The issue presently before the Court involves determining how close the relationship must be between the initial act or contract and the accompanying right before that right can be waived.

Comstock cites instructive case law on this issue. One such case is *Stewart v. LaGrand*, 526 U.S. 115 (1999). In *Stewart*, an inmate sentenced to death asserted a claim that execution by lethal gas was unconstitutional. The inmate, however, previously had been permitted to choose between lethal injection and lethal gas for his manner of death, and chose lethal gas. *Stewart*, 526 U.S. at 119. The Supreme Court held that "[b]y declaring his method of execution, picking

9

lethal gas over the State's default form of execution – lethal injection – [the inmate] has waived

any objection he might have to it." *Id.* In other words, because the inmate chose the lethal gas

option, he waived his right to challenge the constitutionality of execution by lethal gas.

Comstock also cites cases where First Amendment free speech rights were waived

because of prior contracts limiting speech. For example, in *Paragould Cablevision, Inc. v. City

of Paragould, Arkansas*, the plaintiff, a telecommunications company, entered into franchise

agreement with the defendant, a city entity, whereby the plaintiff was required to notify and gain

approval from the defendant before soliciting advertising. 930 F.2d 1310, 1314 (8th Cir. 1991).

The Court explained that "[b]y entering into the franchise agreement . . . [the plaintiff]

effectively bargained away some of its free speech rights." *Id.* at 1315. The court further

explained that "[the plaintiff] could have bargained for an unqualified right to solicit and transmit

advertisements," but that "[it] simply failed to protect its commercial rights." *Id.* Finally, the

court stated that "[the plaintiff] cannot now invoke the first amendment to recapture surrendered

rights." *Id.*; *see also Homeworx Franchising, LLC, v. Meadows*, 2009 WL 211918 at *2 (D.

Utah January 26, 2009); *In re George F. Nord Bldg. Corp.*, 129 F.2d 173, 176 (7th Cir. 1942)

(party consenting to an order limiting that party's right to communicate with creditors cannot

later claim that the consent order violates his freedom of speech rights).

The Court draws two observations from the cases cited by Comstock, as well as other

waiver cases reviewed. First, these cases often involve estoppel-type situations where a party

takes a firm position and then changes that position at a later date. The present case shares this

characteristic, since Balfour Beatty waived its right to file a mechanic's lien in the Lien-Free Completion Agreement, then reversed its position and filed a lien in spite of the contract.[3]

The second case law observation is as follows: when a Court finds that a party waived an attendant right because of a prior act or a prior contract, that attendant right usually has a close relationship in subject matter with the prior act or contract. For example, in *Stewart* the prior act at issue involved the selection of lethal gas as the execution method. This act is closely related in subject matter to the attendant right waived, which was whether lethal gas as an execution method was constitutional. In *Paragould Cablevision*, the prior contract at issue, which the plaintiff negotiated itself, directly limited the plaintiff's rights to engage in speech. This contract was closely related in subject matter to the attendant right waived, which was the First Amendment right to free speech. Finally, in *In re George F. Nord Bldg. Corp.*, the prior act at issue involved a party consenting to an order limiting that party's speech rights with creditors. The closely related attendant right waived was the consenting party's First Amendment right to free speech, as it pertained to that order.

Here, when compared to the case law illustrated above, the attendant right Balfour Beatty arguably waived (*i.e.*, the right to absolute privilege in a judicial proceeding) is not closely related in subject matter to the prior contract that would be relied upon to trigger the waiver (*i.e.*, the Lien-Free Completion Agreement's lien waiver provisions). On one hand, the filing of a lien, as well as any waivers related to that right, involve the concepts of recovering sums of money and establishing priority as a creditor. The right that Comstock seeks to find waived, however, has nothing to do with the subject matter of lien-filing, debt collection, or priority establishment. Instead, the policies underlying the absolute privilege in judicial proceedings

---

[3] Indeed, Balfour Beatty suffered the consequences of its change in position, as the Court relied on the lien waiver provisions of the Lien-Free Completion Agreement to invalidate Balfour Beatty's two mechanic's liens. *See* Memorandum Opinion and Order (Dkt. nos. 376, 377).

involve promoting the open and free communication of ideas in court. *See Watt v. McKelvie*, 219 Va. 645, 651 (Va. 1978) (purpose of absolute privilege in judicial proceedings is to permit "individuals who participate in law suits . . . to conduct the proceeding with freedom to speak fully on the issues related to the controversy."). Furthermore, the Lien-Free Completion Agreement mentions nothing implicitly or explicitly about the concept of absolute privilege in a judicial proceeding, or Balfour Beatty's waiver of such a right. Therefore, that close relationship in subject matter evident in the case law above between the attendant right to be waived and the prior act or contract relied upon to trigger that waiver does not exist under the facts of this case. As a result, the Court rejects Comstock's argument that Balfour Beatty waived its judicial privilege by contracting away its right to file a lien, which means that Comstock's slander of title claim cannot survive on this ground.

## B. Whether Comstock's Abuse of Process Claim Must be Dismissed.

Comstock argues that Balfour Beatty abused the judicial process because it filed and instituted a suit to enforce the mechanic's liens with an ulterior purpose, which resulted in unnecessarily implicating hundreds of condominium unit owners, trustees, and lenders as the Third Party Defendants. "To sustain a cause of action for abuse of process, a plaintiff must plead and prove: (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." *Donohoe*, 235 Va. at 539 (citing *Mullins v. Sanders*, 189 Va. 624, 633 (Va. 1949); *Glidewell v. Murray-Lacy*, 124 Va. 563, 570 (Va. 1919)). "The distinctive nature of malicious abuse of process lies in the perversion of regularly-issued process to accomplish some ulterior purpose for which the procedure was not intended." *Id.* at 539. "A legitimate use of process to its authorized conclusion, even when carried out with bad intention, is not a malicious abuse of that process." *Id.* at 540. "Process is maliciously

abused when it is used oppressively, *e.g.*, as 'a whip to force the payment of an alleged indebtedness.'" *Id.* (quoting *Mullins*, 189 Va. at 635). Importantly, "abuse of process is 'the wrongful *use* of process *after* it has been issued.'" *Tibbetts v. Yale Corp.*, 47 Fed. Appx. 648, 654, 2002 WL 31123873 at *4 (4th Cir. 2002) (unpublished opinion) (quoting *Triangle Auto Auction v. Cash*, 380 S.E.2d 649, 650 (Va. 1989) (emphasis in original)); *see also Donohoe*, 235 Va. at 531 ("The gravamen of the tort lies in the abuse or perversion of the process after it has been issued.").

Here, Balfour Beatty argues that it filed the liens in good faith and that it was required by the Virginia mechanic's lien statute to name the hundreds of Third Party Defendants in its lien filings and in the present action because those parties had a property interest in the Project. Specifically, Balfour Beatty relies on Va. Code Ann. §43-4, which mandates that "[t]he memorandum . . . show the names of the owner of the property sought to be charged." Balfour Beatty also relies on Va. Code Ann. § 43-3, which states:

> If the building or structure being constructed . . . is part of a condominium . . . any person providing labor or furnishing material to one or more units or limited common elements within the condominium pursuant to a single contract *may perfect a single lien encumbering the one or more units which are the subject of the contract* or to which those limited common elements pertain, and for which payment has not been made.

(emphasis added).

The Court declines to rule on the issue of whether Balfour Beatty's decision to implicate the Third Party Defendants in the present lawsuit through the two mechanic's liens comports with the Virginia lien statute. However, such a ruling is not necessary in resolving the abuse of process issue. Given the above statutory language, the Court believes that Balfour Beatty's decision to file the liens against any party who possessed an interest in the Project (*i.e.*, the individual unit owners, trustees, and lenders) can be characterized, at a minimum, as reasonable.

Furthermore, Balfour Beatty's conduct subsequent to filing the liens can also be described as reasonable. Indeed, before it filed the third party complaint, Balfour Beatty attempted to avoid joining all owners, lenders, and trustees to the action by offering to accept a bond for the face value of the mechanic's liens.[4] And Balfour Beatty was meticulous in working with the Court to ensure that the list of Third Party Defendants was current and accurate.

Balfour Beatty's conduct throughout the lien filing and enforcement process is not of the type that qualifies as an abuse of process. None of Balfour Beatty's actions suggest that it was oppressively misusing the lien filing procedure to "to accomplish some ulterior purpose for which the procedure was not intended." *Donohoe*, 235 Va. at 539-540. For these reasons, the Court finds that Balfour Beatty did not abuse the judicial process. Accordingly, Comstock's abuse of process claim shall be dismissed.

Comstock argues that Balfour Beatty filed its liens and brought the suit to enforce those liens in order to leverage Comstock into settlement. In making this argument, however, Comstock relies primarily on events occurring *before* the liens were filed. As mentioned above, "abuse of process is 'the wrongful *use* of process *after* it has been issued.'" *See Tibbetts v. Yale Corp.*, 47 Fed. Appx. 648, 654, 2002 WL 31123873 at *4 (4th Cir. 2002) (unpublished opinion) (quoting *Triangle Auto Auction*, 380 S.E.2d at 650 (emphasis in original)). The Court is aware of no fact in the record originating after process was issued that would suggest abuse.

## C. Whether Comstock is entitled to attorney's fees for the expenses it incurred in litigating issues related to the two mechanic's liens filed by Balfour Beatty.

As mentioned above, Comstock was the prevailing party on the issue of whether the two mechanic's liens filed by Balfour Beatty were valid.[5] It now seeks attorney's fees for the

---

[4] Comstock declined this offer.
[5] See Memorandum Opinion and Order (Dkt. nos. 376, 377) (invalidating both liens).

expenses it incurred in litigating this issue. Virginia adheres to the "American Rule" for attorney's fees, which provides that attorney's fees are not recoverable by a prevailing litigant unless a statutory or contractual provision provides for such an award. *See Lee v. Mulford*, 269 Va. 562, 565 (Va. 2005); *Dowling v. Rowan*, 270 Va. 510, 521-522 (Va. 2005). A noteworthy exception to this rule exists, however: "where a breach of contract has forced the plaintiff to maintain or defend a suit with a third person, he may recover the counsel fees incurred by him in the former suit provided they are reasonable in the amount and reasonably incurred." *Hiss v. Friedberg*, 201 Va. 572, 577 (Va. 1960); *see also Owen v. Shelton*, 221 Va. 1051, 1055 (Va. 1981).

Considering this exception, the issue becomes whether Balfour Beatty's two lien filings caused Comstock to maintain or defend a suit with the Third Party Defendants. If so, Comstock could be entitled to attorney's fees. Balfour Beatty argues that the facts of this case do not fall under the exception to the American Rule because Comstock was never placed in an adversarial relationship with the Third Party Defendants. Instead, Comstock's interest in the lien proceedings actually aligned with that of the Third Party Defendants, since these parties all sought to remove the two liens from the Project. Balfour Beatty also notes that no cross-claims were filed between Comstock and the Third Party Defendants. As a result, Balfour Beatty argues, Comstock did not maintain or defend a suit with a third person.

The Court rejects Balfour Beatty's argument. Balfour Beatty seeks to add an adversarial requirement to the American Rule exception noted above. Such a requirement might be appropriate if the language of the exception only covered plaintiffs *defending* suits with third persons. But the exception is much broader than this, as it also applies to plaintiffs who *maintain*

15

a suit with a third person. The Court is of the view that one can clearly *maintain* a suit with a third person without being an adversary to that person.

Here, Comstock was forced into a litigation with the Third Party Defendants when Balfour Beatty included the Defendants in the lien proceedings. Furthermore, Comstock represented at the summary judgment hearing that it had significant interaction with these Defendants and their law firms. Even if these interactions were intended to be mutually beneficial, the situation can still be characterized as Comstock "maintaining" a suit with the Third Party Defendants.[6] Therefore, the Court finds that Balfour Beatty forced Comstock to maintain a suit with a third person. *See Hiss*, 201 Va. at 577.

This finding does not mean that Comstock is automatically entitled to attorney's fees, however. To be entitled to attorney's fees, Comstock must prove at a later stage in this litigation that the fees were "reasonable in the amount and reasonably incurred." *Id.*

Additionally, attorney's fees are only recoverable for claims in which Comstock is the prevailing party. *See Lee v. Mulford,* 269 Va. at 565. As mentioned above, Comstock is not the prevailing party in its slander of title and abuse of process claims. Therefore, Comstock is not entitled to recover any attorney's fees incurred in connection with these two claims.

## D. Whether Balfour Beatty breached the Lien-Free Completion Agreement by filing the two mechanic's liens on the Project.

As mentioned above, the parties requested that the Court conduct an evidentiary hearing to determine the validity of the two mechanic's liens filed by Balfour Beatty. The Court held the hearing, and then issued a Memorandum Opinion and Order (Dkt. nos. 376, 377) finding the following: (1) that the Lien-Free Completion Agreement was supported by consideration; (2) that

---

[6] Two of the dictionary definitions for the word "maintain" are (1) "to keep in an existing state"; and (2) "to support or provide for." *Merriam Webster's Dictionary.* These definitions suggest that "maintaining" can involve the act of helping.

the lien waiver provisions in the Agreement were unconditional; (3) that Comstock did not breach the Agreement before Balfour Beatty filed the liens; and (4) that the liens were invalid. The Court declined to rule, however, on the issue of whether Balfour Beatty breached the Lien-Free Completion Agreement by filing the liens. Comstock now asks the Court to make such a ruling.

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (Va. 2009) (quoting *Filak v. George*, 267 Va. 612, 619 (Va. 2004)). "The plaintiff bears the burden to establish the element of damages with reasonable certainty." *Id.* (citing *Nichols Construction Corp. v. Virginia Machine Tool Co., LLC*, 276 Va. 81, 89 (Va. 2008)). "Damages that are contingent, speculative, and uncertain are not recoverable because they cannot be established with reasonable certainty." *Id.* (citing *Shepherd v. Davis*, 265 Va. 108, 125 (Va. 2003); *Crist v. Metropolitan Mortgage Fund, Inc.*, 231 Va. 190, 195 (Va. 1986)).

For the reasons stated in the Court's Memorandum Opinion on the lien validity issue (Dkt. no. 376), Comstock has met the first two elements of a breach of contract action. Specifically, the first breach element is met because Balfour Beatty had a legally enforceable obligation to refrain from filing a mechanic's lien. And the Opinion concluded that Balfour Beatty violated this obligation by filing liens on the Project, which means that the second breach element is met. However, Comstock has failed to "establish the element of damages with reasonable certainty" at this stage of the litigation. *See Sunrise Continuing Care*, 277 Va. at 154

(citing *Nichols Construction Corp*, 276 Va. at 89).[7] Therefore, the Court finds that Comstock has not met the third element at this point in time.

Because the first two breach elements (*i.e.*, the "liability" elements) are satisfied, however, the Court shall grant summary judgment in favor of Comstock on these two elements. Comstock may attempt to prove the damages element beyond a reasonable certainty at trial.[8]

## E. The Six Delays Outlined in the Harmon Report

A contentious issue in this litigation revolves around who caused the delays which prevented Balfour Beatty from meeting substantial completion dates. The parties have engaged in ample discovery on this issue and have disputed the admissibility of certain delay evidence. Resolution of this matter requires a careful analysis of the discovery history in this case.

Comstock sought to obtain Balfour Beatty's position on alleged delays through Interrogatories 4 and 5. In its response to these Interrogatories, Balfour Beatty referred Comstock to expert reports. The relevant expert report, prepared by Dr. Harmon, identified six "primary" delays. These alleged delays consist of the following: (1) delays caused by Comstock's alleged failure to obtain a building permit in a timely manner; (2) delays caused by the allegedly late approval of sprinkler drawings; (3) delays caused by a lack of utility services (*e.g.*, gas service) on the worksite that allegedly prevented Balfour Beatty from having the resources necessary to complete work; (4) delays caused by changes in the Fair Housing Act and Americans with Disabilities Act, which impacted, *inter alia*, the plumbing arrangement, cabinet installation, and wall placement; (5) delays caused by incomplete drawings and plans regarding

---

[7] Comstock has alleged that it incurred significant direct damages to indemnify and defend third parties in this litigation as a result of Balfour Beatty's lien filings. Whether these damages are direct damages or consequential damages barred by contract is a disputed issue of material fact.

[8] Evidence of damages related to Comstock's slander of title and abuse of process claims is unnecessary because, as stated above, those claims shall be dismissed.

the landscaping areas surrounding the two towers and retail units; (6) delays caused by a window order requiring Balfour Beatty to fabricate, ship, and install new windows on East Tower floors eight through eleven, which were different than the lower windows. In addition to the "primary" delays, Dr. Harmon identified various "secondary" delays on pages 23-24 of her report.[9]

Comstock alleges that Balfour Beatty, throughout discovery, has alluded to "numerous other delays" besides those mentioned above. In an attempt to identify all alleged delays, Comstock sent a letter to Balfour Beatty on May 6, 2009 requesting that Balfour Beatty supplement its Answers to Interrogatories 4 and 5 (*i.e.*, the Interrogatories focusing on delay issues), so as to "avoid the need to file discovery motions." (Dkt. no. 455-3) Balfour Beatty responded on May 12, 2009 by writing: "You state that Balfour Beatty's expert report does not adequately answer Interrogatory Nos. 4 and 5. The schedules utilized by Dr. Harmon in her analysis are responsive to those requests and were produced under separate cover." (Dkt. no. 455-4). In essence, Balfour Beatty responded to Comstock's request for identification of additional delays besides those outlined in Dr. Harmon's expert report by referring Comstock back to that same report. Comstock also sought to uncover evidence of additional delays in depositions, but with little success.

Now, at the summary judgment stage, Balfour Beatty proffers novel delays that Comstock alleges were not identified by Balfour Beatty in discovery. Comstock argues that it was unfairly surprised by these delays, and that the Court should not consider them in its

---

[9] Balfour Beatty also listed delays in its response to Interrogatory 2, which was Comstock's request that Balfour Beatty identify its defenses. These delays, which are subsumed in large part by the delays listed in the Harmon report, are as follows: (1) delays in obtaining the building permit and its effect on the sprinkler permit; (2) changes to the basic layout of condominium units due to Federal Housing Administration and Americans with Disabilities Act issues; (3) revisions to landscaping drawings, which increased the sitework and masonry work on both buildings; (4) revisions to the design of the Project's skin and tower elements; (5) late design changes and approvals of cabinets which delayed cabinet work and activities; and (6) delays in "the close-out process," which "creat[ed] additional impacts to Balfour."

summary judgment analysis or at trial. Comstock further argues that Balfour Beatty should be limited to relying on only the six primary delays contained in Dr. Harmon's report.

Balfour Beatty initially responded to these arguments in its summary judgment memoranda by asserting that Comstock was not unfairly surprised by the novel delays because the delays were evident in Balfour Beatty's Response to Interrogatory 2, as well as in other documents it provided in discovery, such as schedule updates. However, when questioned on this issue at the summary judgment hearing, Balfour Beatty relented and represented that it would only pursue the six primary delay claims contained in the Harmon report at trial. The Court finds that holding Balfour Beatty to its word, and limiting its delay claims to the six primary delays listed in the Harmon report, is the proper remedy in this case.

The Court believes this result is fair because of how the delay issue unfolded in discovery. As mentioned above, Comstock repeatedly attempted, through interrogatories, letters, and depositions to identify the specific delays that Balfour Beatty believed prevented it from attaining substantial completion by certain dates. Balfour Beatty consistently responded to Comstock's attempts in discovery to identify delays by referring Comstock to Dr. Harmon's report. Given this discovery history, requiring Comstock to litigate novel delay claims raised for the first time at the summary judgment stage would be unfair and prejudicial. *See* 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2001 (2d ed. 1987) (The purpose of the federal discovery rules is "to avoid surprise and the possible miscarriage of justice, to disclose fully the nature and scope of the controversy, to narrow, simplify and frame the issues involved, and to enable a party to obtain the information needed to prepare for trial."). For these reasons, the Court finds that Balfour Beatty may only pursue the six primary delays specifically identified in the Harmon report at trial.

## F. Remaining Summary Judgment Arguments

The Court concludes that all other matters raised and briefed by the parties at the summary judgment stage involve issues of disputed material fact. Therefore, the parties' motions pertaining to these matters shall be denied.

## V. CONCLUSION

For the foregoing reasons, the motions for partial summary judgment filed by Plaintiff/Counter-Defendant Comstock and Defendant/Counter-Plaintiff Balfour Beatty shall be granted in part and denied in part. Comstock's Slander of Title (Count II) and Abuse of Process (Count III) claims shall be dismissed. Furthermore, Comstock shall be entitled to attorney's fees incurred in defending the lien proceeding action, provided that Comstock can prove that these attorney's fees were reasonable and not related to the slander of title or abuse of process claims. Next, summary judgment shall be granted in favor of Comstock on the issue of whether Balfour Beatty breached the Lien-Free Completion Agreement for the first two breach elements only (*i.e.*, the "liability" elements). Comstock may attempt to meet the third and final element by proving damages beyond a reasonable certainty at trial. Finally, Balfour Beatty may only pursue the six primary delay claims outlined in the Harmon report.

Entered this 14th day of August, 2009

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

21