IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| **COMSTOCK POTOMAC YARD, L.C.** ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | |
| v. ) | Civil Action No.:1:08 cv 894 |
| ) | Hon. Liam O'Grady (TCB) |
| **BALFOUR BEATTY CONSTRUCTION, LLC** ) | |
| ) | |
| Defendant/Counter-Plaintiff. ) | |
| ) | |

**COMSTOCK POTOMAC YARD, L.C.'S OPPOSITION TO
BALFOUR'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

COMES NOW, Plaintiff/Counter-Defendant Comstock Potomac Yard, L.C. ("Comstock"), by and through counsel, and submits this opposition to Balfour Beatty Construction, LLC's motion for judgment as a matter of law.

### I.   BALFOUR BEARS THE BURDEN OF PROOF REGARDING LIQUIDTED DAMAGES.

Balfour's Motion for Judgment is based on a misstatement of the law regarding which party bears the burden of proof regarding liquidated damages.  Both the Contract and the common law place the burden of proof squarely in the hands of Balfour.  Further, Comstock provided ample evidence in its case-in-chief that the delays experienced were inexcusable and the result of Balfour's failure to timely prosecute critical work of the Project and complete its contractual obligations.  For these reasons, the Court should deny Balfour's motion for Judgment.

**A.   Balfour Misstates the Law.**

Any requirement for Comstock to make a *prima facie* case of delay is satisfied by Balfour's admission that it did not meet any of the interim milestone dates or the time for

1

Substantial Completion of the Project as established by Change Order 15.[1]  Once the party assessing liquidated damages establishes that the contract requirements were not substantially complete by the contract completion date, "the burden going forward shifts to the party opposing liquidated damages to show that any delays were excusable and that it should be relieved of all or part of the assessment." PCL Const. Servs., Inc. v. United States, 53 Fed.Cl. 479, 484 (2002) citing In re Cent. Ohio Building Co., PSBCA No. 2742, 92-1 B.C.A. (CCH) ¶ 24,399 at 121,824 (1992); Appeal of C.H. Hyperbarics, Inc., ASBCA No. 49375, 04-1 BCA P 32568 (2004).

"As a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." Sauer, Inc. v. Danzig, 224 F.3d 1340, 1347 (Fed. Cir. 2000); see also PCL Const., 53 Fed.Cl. at 484 citing In re Cent. Ohio Building Co., PSBCA No. 2742, 92-1 B.C.A. (CCH) ¶ 24,399 at 121,824 (1992).

These general statements of law are also in accord with the requirements of the Contract, which place the burden of showing excusable delay squarely with Balfour, not with Comstock. Article 8.1.4 of the General Conditions provides for the assessment of liquidated damages "in the event the Contractor does not meet the Substantial Completion Dates set forth in the Project Schedule." (CPY Ex. 82, Gen. Cond. § 8.1.4).  The Article further provides that:

> The Contractor further agrees that the liquidated damages established herein apply only to the ***Contractor's failure to complete the Work on or before the applicable Substantial Completion Date*** established by the Contract, ***subject to extension as a result of Excused Delays***, and that such liquidated damages do not apply to, nor shall they affect, waive or

---

[1] Balfour has consistently admitted throughout this dispute that it did not meet the interim milestone dates and Substantial Completion date established in Change Order 15.  Evidence of this can be found in Balfour's Responses to Comstock's Interrogatories where Balfour asserted that the various levels on the Project were substantially complete upon issuance of the Temporary Certificates of Occupancy.  Each of the dates proposed by Balfour are later than the corresponding interim milestone in Change Order 15.  (Compare Balfour Responses to Interrogatories, pp. 16-18, with Change Order 15, CPY Ex. 89-A).

> diminish in any way, any other damages for which the Contractor may be responsible as a result of any other negligence or breach of contract.

(CPY Ex. 82, Gen. Cond. § 8.1.4) (emphasis added). The use of the term "Excused Delays" is not meaningless; "Excused Delay" is a defined term in the Contract.

Under Article 8.3.1, an "Excused" or "Excusable Delay" refers to any number of delays which may entitle the Contractor to an extension of the Contract time. (CPY Ex. 82, Gen. Cond. § 8.3.1). However, as Article 8.3.1 states, if the contractor believes that it has experienced such an Excusable Delay, "then the Contract Time shall be extended by Change Order subject to and in accordance with § 4.3.8.1 above." (Id). Article 4.3.8.1 provides that "[n]o adjustment to the Contract Time shall be granted, unless the ***Contractor furnishes documentation and evidence*** satisfactory to the Owner." (CPY Ex. 82, Gen. Cond. § 4.3.8.1) (emphasis added). This documentation must: (1) ***demonstrate that the impacted activities are on the Project's critical path***; (2) establish that "***the delay is beyond the control and not the fault of the Contractor, its Subcontractors or suppliers***;" and (3) demonstrate that the Contractor has complied with all claims and notice submission requirements. (CPY Ex. 82, Gen. Cond. § 4.3.8.1).

A contract "becomes the law of the case unless the contract is repugnant to some rule of law or public policy." D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995). The Contract provisions in effect here, as well as the common law, demonstrate that Balfour maintains the burden of proof regarding liquidated damages; if Balfour believes it was Excusably Delayed, it must demonstrate that the delay was not its fault. For these reasons, this Court should deny Balfour's Motion for Judgment as a Matter of Law.

### B. Comstock Introduced Sufficient Evidence Attributing and Allocating the Delays to Balfour.

Notwithstanding Balfour's admitted failure to meet the Change Order 15 interim milestones and Substantial Completion dates, Comstock introduced abundant evidence in its

case-in-chief demonstrating that the delays to the Project were Balfour's fault. To the extent there was any doubt, Comstock specifically reserved the right to examine Balfour's witnesses beyond the scope of direct as part of Comstock's case-in-chief. (Tr. 762:25 – 763:10 (Seeger)). As counsel stated:

> Mr. Seeger: And to the extent that there are Balfour witnesses that are going to be called, ***I reserve my right to go beyond the scope of direct as part of my case in chief***, if I may.

(Tr. 762:25 – 763:2 (Seeger)) (emphasis added). The Court agreed with Comstock, recognizing that calling all witness multiple times would be a waste of time:

> The Court: Yeah, it's a nonjury case and you would have a right to call them in your case in chief, and it doesn't make any sense to bring them here twice. So, I will allow that.

(Tr. 763:5 – 763:8 (The Court)). The Court reiterated this point when Balfour asked for a clarification. (Tr. 763:13-23 (Ewald)).

As a result, for purposes of this motion, the Court should consider all testimony and exhibits presented at trial. Detailing in this brief all of the evidence presented in the case attributing delay to Balfour is unnecessary and redundant given the other briefs filed concurrently. For that reason, Comstock hereby incorporates by reference its Proposed Findings of Fact as if fully set forth herein, but specifically Paragraphs 93 through 301.

### 1. Comstock Established the Extent of the Delay Caused by Balfour.

Contrary to Balfour's assertion, Comstock established the extent of the delay caused by Balfour.[2] First, Change Order 15 provides the start dates for the assessment of liquidated

---

[2] Comstock contests that it had any such burden. Balfour cites <u>Techdyn Sys. Corp. v. Whittaker Corp.</u>, 245 Va. 291, 427 S.E.2d 334 (1993) for the proposition that Comstock had to establish the cause and duration of an alleged delay before assessing liquidated damages. (<u>See</u> Balfour Supplemental Brief in Support, p. 4). Balfour's reliance is misplaced. Unlike here, the contract at issue in <u>Techdyn</u> did not contain a liquidated damages provision and the plaintiff there was seeking actual delay damages. <u>See</u> <u>Techdyn</u>, 245 Va. 291, 427 S.E.2d 334. The very purpose of

4

damages. (CPY Ex. 89-A). As discussed above, Balfour admits that it did not reach Substantial Completion for any of the interim milestones or the Project Completion date established therein. See note 1, supra.

Comstock also provided evidence sufficient to establish the cut-off date for liquidated damages. In his testimony, Greg Benson, Comstock's President and Chief Operating Officer, stated that Comstock assessed liquidated damages up through December 1, 2008. (Tr. 680:2-20 (Benson); CPY Ex. 231). Comstock reached this date by analyzing the remaining unfinished items listed on the punchlist at the time Balfour walked off of the Project in September 2008, and determined that most, if not all, of the remaining items could be completed within ninety (90) days of Balfour's departure. (Tr. 680:2 – 681:7 (Benson)).

Not only has Comstock provided a date certain for the termination of liquidated damages, but its determination of December 1, 2008 as an end-date is reasonable. As a result, Comstock has adequately established the extent of the delays for assessment of liquidated damages.

### 2. Comstock has Allocated the Entire Delay to Balfour

Comstock allocates the entire delay to Balfour. Balfour's mere disagreement with Comstock's total allocation of fault does not mean that Comstock failed to meet any such burden. To support its position, Balfour mistakenly points to a small portion of Dan Strotman's testimony. (See Balfour's Supplemental Brief in Support, p. 6).

Balfour's reliance on Strotman's testimony is flawed for two important reasons: (1) Strotman's personal opinion regarding one portion of the Project is not an analysis of that delay's impact on the overall Project schedule; and (2) Comstock recovered any delay Strotman referenced by accelerating the drywall subcontractors.

---

a liquidated damages clause is to "obviate the need for the nonbreaching party to prove actual damages." O'Brian v. Langley School, 256 Va. 547, 552, 507 S.E.2d 363, 366 (1998).

### a. Strotman Made no Analysis of Overall Impact on the Project Schedule.

First, Strotman's opinion that there was some delay due to the lack of a building permit is insufficient to show that Comstock failed to allocate fault for the Project's delays. Strotman's testimony is far from absolute or conclusive, indicating only that "***there was the possibility*** that the building permit delayed [Balfour] in some respects." (Tr. 362:21-23 (Strotman)) (emphasis added). When asked by the Court whether he could quantify those delays, Strotman stated that "***it's possible*** that there were two to three to maybe four weeks of time that they could have been hanging drywall if they had a building permit in some areas. Not all areas, but in some." (Tr. 379:22 – 380:1-4 (Strotman)) (emphasis added).

Strotman made no attempt to analyze what – if any – impact these possible delays may have had on the critical path or, for that matter, the overall Project schedule. (See Tr. 362:21-23, 379:1 – 380:4 (Strotman)). Further, Strotman's testimony regarding any potential delay was limited solely to hanging of drywall and did not take into consideration any other activity, other trades, or for that matter, any later acceleration or delay that occurred on the Project. (Id).

Additionally, Strotman's subjective opinion as to this one issue is far from the detailed schedule analysis required by the Contract to allow for a time extension. As stated above, Article 4.3.8.1 requires that Balfour provide documentation and evidence demonstrating that "the impacted activities are on the critical path of the Project's schedule." (CPY Ex. 82, Gen. Cond. § 4.8.3.1). Balfour provided no such documentation to Comstock and Strotman's opinion does not purport to make any such analysis.

### b. Comstock Recovered the Time Discussed by Strotman Through Acceleration of the Drywall Subcontractors.

Balfour's reliance on Strotman's testimony is further misplaced as Comstock recovered the delay discussed by Strotman through targeted acceleration of the drywall subcontractors.

Comstock paid some $200,000 to accelerate the drywall and recover time lost on the Project. (Tr. 653:5-15 (Benson)).  This acceleration allowed the drywall subcontractor to improve its schedule and allowed Comstock to recover any impact to the overall Project schedule which may have been attributable to the issuance of the building permit.  (Tr. 653:11-17 (Benson)).  This schedule improvement was subsequently held by those trades that immediately followed the drywall subcontractors. (Tr. 653:18 – 654:2 (Benson)).

However, the Project again experienced delay once time came for C.A. International (the cabinet installers) to perform; delays that ultimately held up other trades. (Tr. 654:3-24, 657:12-22 (Benson)).  This, and other, supervening delays completely wiped out all improvements made to the schedule by accelerating the drywall subcontractors.  (See id).

Accordingly, Comstock's allocation of all delays to Balfour is appropriate, as Comstock recovered delay related to the drywall subcontractors only to see Balfour's other subcontractors and suppliers once again delay the overall Project schedule.  Comstock has met its burden demonstrating that Balfour was responsible for all of the delays, and this Court should deny Balfour's Motion for Judgment as a Matter of Law.

## II. COMSTOCK'S DAMAGES ARE DIRECT DAMAGES AND NOT COVERED BY THE WAIVER.

The damages incurred by Comstock and complained of by Balfour are not consequential; they are direct.  Balfour simply mischaracterizes Comstock's damages in an attempt to force them under the Contract's waiver of consequential damages.

"Direct damages are those that flow 'naturally' from a breach of contract, *i.e.*, those that, in the ordinary course of human experience can be expected to result from the breach, and are compensable." R.K. Chevrolet, Inc. v. Hayden, 253 Va. 50, 56, 480 S.E.2d 477 (1997); Roanoke Hosp. Ass'n. v. Doyle & Russell, Inc., 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975).  As the

7

evidence at trial demonstrated, Comstock incurred damages as a direct result of Balfour's breaches of contract by failing to pay Atlas monies received from Comstock and then not removing Atlas' liens from the Project. (Facts ¶¶ 383 – 413). Not surprisingly, Balfour's breaches of its financial obligations directly affected Comstock's financing.

These are the type of damages normally expected in the ordinary course of human experience, and especially by those sophisticated in the construction and development industry, such as Balfour. In fact, Balfour *hoped* its actions would impact Comstock to better Balfour's negotiating position. David Laib ("Laib") wrote Atlas advising them that Balfour would leave the mechanic's lien in place to "leverage" Comstock. (Facts ¶ 355). Balfour must not be allowed to shirk the consequences of its actions behind an exculpatory provision designed for wholly unrelated circumstances.

### A. The Costs and Fees Incurred by Comstock to Ensure Project Financing are Direct Damages.

The Atlas liens compelled changes in the terms and source of Comstock's funding for the Project. As Labovitz summarized at trial when asked whether Comstock incurred any damages as a result of the Atlas liens:

> Yes.
>
> \* \* \*
>
> Specifically, it created complications within the financing, which I believe was the intention of the lien filings. And put us in a compromised position with the existing lender [Corus] to the extent that they [Corus] then refused to extend further financing beyond what they had, were in the process of considering.
>
> \* \* \*
>
> Corus then took a position that they were no longer interested in providing financing to the project. And we were put in a position of having to procure replacement financing. And we had

> significant fees associated with providing that replacement funding.

(Tr. 66:19 – 67:15 (Labovitz))  Because Comstock's damages flowed naturally from Balfour's Breaches, the Atlas liens, and Balfour's negotiating strategy, they are direct damages and are not waived by the consequential damages waiver.

### 1. The Corus Bank Loan Extension Fees were Incurred as a Direct Result of Atlas' Liens.

In October 2007, Comstock received from Atlas notice of intent to lien the Project.  (Tr. 98:12-19 (Labovitz); CPY Ex. 195).  As it was contractually obligated to do, Comstock informed Corus Bank about Atlas' intent to lien the Project.  (Tr. 98:12 – 100:4 (Labovitz)).  Shortly thereafter, Comstock and Corus Bank entered into discussions regarding a second extension to the terms of the Corus Bank loan.  (Tr. 87:17 – 89:17 (Labovitz)).  Aware of the potential liens against the Project, Corus included in its proposed extension terms a $133,000 loan fee which had not previously been required with prior loan modifications.  (Tr. 69:2-9 (Labovitz); BB Ex. 1030).

Because of the Atlas lien, and the disquiet it engendered about the status of Balfour payments (or non-payments) to other subcontractors, Corus Bank became deeply concerned about the Project.  As Labovitz stated:

> I think that at that point Corus was no longer happy with the situation, was very suspect of how the project was being handled, and we might have been able to negotiate a better deal had that not been the case.

(Tr. 69:5-14 (Labovitz)).  Ultimately, Comstock was forced to pay $133,000 as part of the cost to extend the Corus loan. (Tr. 68:18-23 (Labovitz)).

### 2. Stonehenge and KeyBank Funding Were Required Because Corus Bank Refused to Continue Funding the Project as a Result of the Atlas Liens.

After Atlas filed its mechanics liens and Corus Bank stopped funding the Project, Comstock needed short-term operating capital. As Labovitz testified:

> Again, we were in a position where we needed financing to cover costs associated with operating the project. *Corus at that point based on their suspicions of what was transpiring between us and Balfour* related to the processing of their money and payments from them that weren't being paid to subcontractors *and concerns over additional liens, potentially additional liens, they weren't funding anymore*. So, we needed to provide financing to operate the project.

(Tr. 71:12-23 (Labovitz)) (emphasis added).

Comstock needed bridge financing while it searched for permanent funding for the Project, ultimately borrowing short-term funds from Stonehenge. (Tr. 70:2-21 (Labovitz)) For that loan – the best available source of money – Comstock paid loan origination fees. As Labovitz stated:

> Q. Did Comstock pay a transaction fee in order to obtain the bridge loan from Stonehenge Funding?
>
> A. Yes.
>
> Q. In what amount?
>
> A. $200,000.

Eventually, Comstock obtained long-term funding for Project completion with KeyBank in a transaction combining the financing of two Projects into a single loan. (Tr. 74:7 – 16 (Labovitz); CPY Exs. 251, 252; Tr. 76:13 – 77:13 (Labovitz)). The KeyBank funding required that Comstock pay two associated fees: an up-front commitment fee of $734,385 and an advisory fee of $2,937,542. (Tr. 74:23 – 75:18 (Labovitz); CPY Ex. 252) In total, Comstock paid $3,671,927 in fees to KeyBank, 72.24% of which ($2,652,600) was attributable to the Project. (Tr. 76:10 – 77:19 (Labovitz); CPY Ex. 251, 252).

The fees incurred by Comstock related to obtaining the Stonehenge and KeyBank loans flow directly from the two Atlas liens. Corus Bank refused to continue financing the Project *because* of the Atlas liens, forcing Comstock to obtain working capital from different sources. (Tr. 71:16-23, 73:6-13 (Labovitz)). Until the Atlas liens, Corus was content to renegotiate the construction loan. After the Atlas liens, Corus refused to renew its deal. Balfour succeeded in exerting leverage on Comstock – it simply could not force capitulation. The cost of its leverage was known: in commercial development, the filing of a mechanic's lien affects Project financing and causes developers to pay expenses that otherwise would not arise.

### 3. Damages as a Result of Unit Purchase Cancellations Tied to the Atlas Liens are Direct Damages.

Balfour's breaches and the Atlas liens also had a direct and immediate impact on Comstock's ability to sell and close numerous condominium units. As Labovitz testified:

> Q. …. Was there any effect on the purchase contracts as a result, sale purchase contracts of individual units as a result of the Balfour and/or Atlas liens?
>
> A. Yes. It's my belief that there were cancellations of contracts as a result of publicity that had been covered, the liens being covered, there was a Washington Business Journal article about it. Also, we were not in a position to enforce the specific performance remedies of the contract, the cancellations. So I believe the answer is yes.

(Tr. 62:6-15 (Labovitz)) Labovitz further identified that certain purchasers canceled their sales contracts during the period that Atlas had liened the Project.

> Q. And did any purchasers cancel their sales contracts or their purchase contracts during the period of time that Atlas had liened the Project?
>
> A. Yes.

11

(Tr. 65:19-22 (Labovitz); Ex. 253) Additionally, Labovitz described the damages that Comstock incurred as a result of the cancellations:

> . As a result of the cancellations we weren't able to make payoffs to the bank. So, as a result of there not having been pay-downs, there was additional interest incurred on outstanding balances under the loans. There were homeowner's fees for units that we continued to own as opposed to not continuing to own. And real estate taxes associated with the ownership of those units that would have transferred to the buyers.

(Tr. 64:17 – 65:1 (Labovitz))

The additional interest, taxes, and homeowner's association fees paid by Comstock are all direct damages stemming from Balfour's breach of contract. The Contract specifically provided that Balfour had an obligation to prevent its subcontractors from filing mechanic's liens on the Project for the exact reason seen here – that a mechanic's lien clouds title to property and makes it difficult for a property owner to sell. See e.g., Rhoads v. Sommer, 931 A.2d 508, 526 (Md. 2007) ("Because the mechanics' lien made it extremely difficult for the owner to sell or encumber his or her land – the lien constituted a cloud on the property owner's title"); People v. Cohn, 160 P.3d 336, 346 (Colo. 2007) ("The filing of a mechanic's lien clouds title to the property."). Balfour knew – and the ordinary course of human experience tells us – that the filing of mechanic's liens impede the sale of property and cause a property seller to incur costs to resolve them. The interest, taxes, and association fees paid by Comstock flow naturally from the Atlas liens, just as Balfour knew they would.

### B. The Personnel Costs and Overhead Damages are not Duplicative or Consequential.

More than half of the approximately $1.2 Million in damages complained of by Balfour are direct damages related to Comstock's completion of Balfour's punchlist work. (CPY Ex. 233).

At the bottom of the first page of Exhibit 233, under the heading "Additional Onsite Supervisory and Administrative actual- Outside Contractor", four contractors – Friends & Co., Sparks, Trade Source, and Triton Security – are listed as having performed certain work on the Project. (CPY Ex. 233). As the simple description establishes, the work performed by these four replacement contractors was directly related to punchlist work. (CPY Ex. 233). These amounts are not related to any of Balfour's delays, but rather, were the direct costs incurred by Comstock to complete Balfour's unfinished punchlist work. These replacement contractors were not Comstock employees or supervisors, and as a result, do not fall within the Contract's consequential damages waiver provisions. (See CPY Ex. 82, Gen. Cond. § 4.3.11).

As to the remaining $492,479.13 complained of by Balfour, Comstock concedes that those damages are directly related to Balfour's failure to timely complete the punchlist on the Project, and would be covered by an award of liquidated damages under the Contract. In the event that this Court finds that the liquidated damages should not be assessed for Balfour's failure to complete the punchlist, Comstock should recover all of its actual damages associated with Balfour's failure to perform punchlist work.

### III. CONCLUSION

For these reasons, the Court should deny Balfour's Motion for Judgment.

Dated: October 23, 2009				Respectfully submitted,

**COMSTOCK POTOMAC YARD, L.C.**
By Counsel

/s/
Stephen M. Seeger (VSB #40548)
James J. Faughnan (VSB #31222)
Michael C. Zisa (VSB #76397)
Kristin E. Protas (VSB #76389)
Attorney for Plaintiff Comstock
Potomac Yard, L.C.

            Quagliano & Seeger, P.C.
            2620 P Street, NW
            Washington, DC 20007
            Telephone: (202) 822-8838
            Facsimile: (202) 822-6982
            E-mail: sseeger@quagseeg.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed with the Court on October 23, 2009, and that the Clerk of the Court will then send a notice of electronic filing (NEF) to the following:

Shelly L. Ewald, Esq. (sewald@wthf.com)
John B. Tieder, Esq. (jtieder@wthf.com)
Brian R. Dugdale, Esq. (bdugdale@wthf.com)
Erica Beardsley, Esq. (ebeardsl@wthf.com)
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
**Attorneys for Balfour Beatty Construction, LLC**

Daniel K. Felsen, Esq.
McManus, Schor, Asmar & Darden, LLP
1155 15th Street, NW
Suite 900
Washington, DC 20005
**Attorney for Non-Party Atlas Comfort Systems USA, LLC**

            _____/s/_____
            Stephen M. Seeger (VSB #40548)
            James J. Faughnan (VSB #31222)
            Michael C. Zisa (VSB #76397)
            Kristin E. Protas (VSB #76389)
            Attorney for Plaintiff Comstock
            Potomac Yard, L.C.
            Quagliano & Seeger, P.C.
            2620 P Street, NW
            Washington, DC 20007
            Telephone: (202) 822-8838
            Facsimile: (202) 822-6982
            E-mail: sseeger@quagseeg.com