# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

COMSTOCK POTOMAC YARD, L.C.      )
                                   )
      Plaintiff/Counterclaim Defendant, )       Civil Action No. 1:08cv894
                                   )       Hon. Liam O'Grady
     v.                              )
                                   )
BALFOUR BEATTY CONSTRUCTION, LLC, )
                                   )
      Defendant/Counterclaim Plaintiff. )
_____ )

<br><br>

## DEFENDANT BALFOUR BEATTY CONSTRUCTION, LLC'S
## POST-TRIAL BRIEF

## I.    INTRODUCTION

Balfour Beatty Construction, LLC ("BBC") proved at trial that Comstock Potomac Yard, L.C. ("Comstock") consistently failed to meet its basic contractual obligations: obtaining building permits from Arlington County (the "County"), providing a correct and complete Project design, procuring site utilities, compensating BBC for Comstock's directed acceleration, and providing unimpeded and unrestricted access to the Work.  BBC proved that Comstock's failures caused the Project delays, yet BBC overcame these obstacles and accelerated its work to meet Comstock's demands to close units in 2006, and exceed Comstock's expectations for completion of the East Tower.  Accordingly, BBC should be awarded judgment in the amount of $2,795,257.58.

Conversely, Comstock failed to meet its burden of proof with respect to each of its claims.  Comstock failed to prove its delay claim against BBC in its case-in-chief.[1]  Comstock also failed to prove entitlement and damages for each of its remaining claims.  Thus, Comstock's claims must be denied in their entirety.  In support of its Post-Trial Brief, BBC attaches hereto its Proposed Findings of Fact.

## II.    BALFOUR BEATTY PROVED ENTITLEMENT TO DELAY DAMAGES

### A.    Delay Damages and Acceleration Costs Under Virginia Law

Claimants seeking damages have the burden to prove a "causal connection" between the breach and the damages asserted.  R.R. Gregory Corp. v. Labar Enter., 2007 WL 3376642, at *7(E.D.Va. 1974)(quotations omitted); see also Techdyn Sys. Corp. v. Whittaker Corp., 427 S.E.2d 334 (Va. 1993).  In order to meet this burden, a party claiming construction delay

---

[1] BBC incorporates by reference its Motion for Directed Verdict and Supplemental Motion for Judgment as a Matter of Law/Dismissal ("Motion for Judgment") as if fully set forth herein.

damages must show that the delay impacted the "critical path," or the longest path to completion of the project. By definition, a delay to a critical path activity will affect the contract completion date. Haney v. United States, 676 F.2d 584, 595 (Ct.Cl. 1982). Virginia courts have accepted the critical path method of analyzing delay claims. See W.M. Jordan Co. v. Sielaff, 1988 WL 619397 (Va.Cir. 1988). Finally, a plaintiff seeking delay damages must also demonstrate that it was not at fault for the delay. Welch v. McDonald, 8 S.E. 711, 714 (Va. 1888). A party cannot recover delay damages if it is unable to show that the other party's delays, rather than its own performance or some intervening factor, caused the damages. Kerr Contracting Corp. v. Coen Co., 1992 WL 884566, at *11-13 (Va.Cir. 1992).

To recover acceleration costs, BBC must demonstrate that 1) delays giving rise to the acceleration were excusable; 2) Comstock ordered BBC to accelerate; and 3) BBC accelerated and incurred costs as a result. McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906, 915 (E.D.Va. 1989)(citing Norair Eng'g Corp. v. U. S., 666 F.2d, 546, 548 (Ct.Cl. 1981)).[2]

## B.     Comstock Caused Delays to the Critical Path

Dr. Harmon's analysis, combined with the fact testimony and contemporaneous Project records presented by BBC at trial, establishes the causal connection between Comstock's actions and the Project delays to the degree of certainty required under Virginia law. BBC prepared its delay and acceleration claims by analyzing the duration of and responsibility for various delays that extended the Project beyond the CO 15[3] completion dates. Dr. Harmon analyzed the Project

---

[2] While BBC was given clear orders to accelerate, "constructive acceleration" occurs when a contractor is denied a time extension that it is otherwise due and, therefore, is forced to speed up its work to meet the original contract date. Fraser Constr. Co. v. U.S., 384 F.3d 1354 (2004).

[3] CO 15, executed on May 25, 2006, inter alia, increased the Contract Sum, established revised times of completion/interim milestone dates, resolved all delays incurred through April 30, 2006, and extended the Project's overall completion date to February 15, 2007.

delays by interviewing Project personnel and reviewing Project records, including electronic schedules and narratives, meeting minutes, correspondence, daily reports, the Contract and certain drawings. Dr. Harmon concluded that there were at least eight (8) major delays to the Project, each the responsibility of Comstock.

In accordance with industry standards on the use of the critical path method, Dr. Harmon examined the impact of each delay to the Project's critical path, utilizing the schedule in effect just prior to each delay. Proposed Finding of Fact, Paragraph ("¶") 328. Starting with the PYR2 Schedule and its updates, Dr. Harmon determined that the critical path delays to Project completion and the interim milestones set forth in CO 15 were the failure of Comstock to obtain the building permits (Delays 1 and 2), and the resultant delays to the approval of the sprinkler drawings (Delays 3 and 4). ¶¶331-339. The other delays were mostly concurrent with the two major delays. Although Dr. Harmon could have analyzed multiple other impacts caused by Comstock, the analysis reached a point of "saturation" given the eight most significant delay events. Dr. Harmon calculated an overall delay to the Project's critical path of 199 calendar days. ¶327.

In contrast, Comstock's expert, Mark Anderson, offered no testimony regarding causes of delay in its case-in-chief and failed to rebut Dr. Harmon's conclusions. Most notably, Mr. Anderson admittedly failed to analyze any events prior to April 30, 2006 relative to Comstock's obligation to obtain the building permits, even in light of his own admission that the building permit caused approximately one month of delay. Mr. Anderson's narrow analysis of certain events beginning on April 30, 2006 ignored the overriding delay to the Project—Comstock's failure to obtain timely the building permits and the resulting impact on the sprinkler drawing review process and hanging of drywall—and failed to consider impacts to the Project from

3

continued Owner-directed changes after April 30, 2006.

      1.     Comstock's Failure to Obtain Building Permits Delayed BBC

The Contract expressly excluded from BBC's scope of work any obligation to procure the building permits and in defining BBC's "Work" stated that "[t]he Work includes all labor, materials, taxes, equipment, insurance, bonds, permits (other than the Building Permit) ..." See Contract General Conditions, § 1.1.3 (emphasis added).[4] Comstock's failure to timely obtain the permits was much more than a mere failure to perform a simple administrative task—it was the overarching and crucial delay to the Project. Without the permits, the critical path activity of hanging drywall—the precursor to all finish activities—could not commence in earnest.

Comstock applied for East and West Tower building permits in May and June 2004, before Comstock and BBC executed a contract. Comstock did not obtain the West Tower permit until July 27, 2006, or 793 days after application. Comstock did not obtain the building permit for the East Tower until September 22, 2006, or 835 days after application. Comstock failed to resolve timely several permitting issues, such as compliance with several 4.1 conditions and completion of its building design. These issues were not BBC's responsibility.

BBC established conclusively that the West Tower building permit was necessary for BBC to perform interior finish work and achieve the revised completion schedule. BBC's Work Plan put Comstock on notice that the building permit was required by April 21, 2006 in order to obtain inspections necessary to hang drywall by May 17, 2006, and meet the revised schedule. Comstock's failure to obtain the West Tower building permit by April 21, 2006 ("DEL1") prevented BBC from moving forward with scheduled activities.

---

[4] Subsection 1.1.3 is consistent with other Contract clauses. Subsection 2.2.2 states that "[e]xcept for the Owner's obligation to pay for the building permits, the Contractor shall obtain ... all necessary permits and licenses[.] See also Contract General Conditions, § 3.7.1.

Both Comstock and BBC personnel confirmed that without the building permit, BBC was unable to obtain close-in inspections and hang drywall.   ¶¶103-107, 163, 164, 166, 196, 197. Prior to hanging drywall, BBC could not move forward with finish trades and complete the Project.   ¶¶103, 105, 165, 198.   BBC went to extraordinary lengths to overcome CCB 46R changes and provided temporary weather protection where necessary, to ensure that it was ready to hang drywall on the second floor of the West Tower by the end of May 2006.   However, BBC was prevented from calling for close-in inspections because of Comstock's failure to obtain the West Tower building permit.   ¶¶166, 196.

Aside from the testimony of Mr. Williams, whose selective memory prevented him from recalling the rules pertaining to closing-in walls without a building permit, and Mr. Benson, who simply proclaimed the building permit delay "a farce," not a single line of testimony or contemporaneous Project record proves, or even suggests, that BBC could obtain building close-in inspections, hang drywall, and progress with its finish trades in the absence of a building permit.   Comstock's Mr. Cook confirmed that Comstock's own belated low voltage approvals and close-in inspections were dependent on the building permit.   ¶190.   At trial, both Mr. Strotman and Comstock's expert, Mr. Anderson, conceded that failure to obtain the building permit caused delay.   In addition to its substantive proof, BBC also established that it provided sufficient notice of the building permit delays to Comstock, including monthly schedule updates and narratives, meetings to discuss the permit, as well as formal letters and requests for time extensions.   ¶¶167, 168, 191, 192, 202, 211.

Comstock attempted to deflect its responsibility for the building permits and building close-in inspections by attributing delay to Atlas for failing to obtain requisite sprinkler shop drawing approvals in a timely manner.   Comstock's attempts were unpersuasive, as the evidence

5

revealed that delays in obtaining the sprinkler drawing approvals were *directly tied* to the late issuance of the building permit. ¶¶166-193, 196.   Moreover, Atlas received the West Tower sprinkler permit on August 10, 2006, only 14 days after the building permit was issued. ¶¶196.

While there was a great deal of conjecture at trial regarding the County's discretion to approve the sprinkler permit absent a building permit, the weight of the evidence demonstrated that everyone (Comstock, BBC and Atlas) understood that the sprinkler permit was dependent upon the building permit.   This is consistent with Mr. J.D. Martin's testimony regarding "standard procedure," the published County requirements, and Mr. Martin's actions on this Project.   It also makes sense in light of the relationship between building and sprinkler design. Messrs. Rice-Johnston and Martin confirmed that building design changes, such as dimension changes and relocation of walls as required by CCB 46R, require sprinkler design changes.   Mr. Martin opined that such changes would be required "99.9 percent of the time." ¶176.

Mr. Martin confirmed that he did not review the sprinkler drawings when they were submitted in December of 2005 because there was no building permit. ¶¶69-70.   The sprinkler drawings sat unreviewed at the County for nearly six months due to the absence of the building permit.   The County's Pre-Design manual provides that sprinkler drawings will be reviewed and sprinkler permits issued *after* the building permit and that the review process may require up to ninety days.   As such, the floor-by-floor submission process that Atlas began in June of 2006 at the County's request was *expected* to require several revisions and resubmissions, and to take up to ninety days.

Late issuance of the East Tower building permit ("DEL2") similarly impacted the sprinkler drawing approval process.   Even after the East Tower building permit was issued on September 22, 2006, the County would not review any East Tower sprinkler drawings until it

completed its review and received a second record set of the West Tower sprinkler drawings. ¶¶274-277.  Once the record set was received, the County approved the East Tower Sprinkler Permit within approximately thirty days.  ¶277.  None of Comstock's evidence or testimony pertaining to Atlas effectively rebuts BBC's overwhelming proof that it was Comstock's failure to timely obtain building permits that caused the elongated sprinkler review process.   The late issuance of building permits was the overriding delay to the Project, not Atlas's sprinkler design.

To quantify these delays, Dr. Harmon analyzed the effect of the late permits on the critical path.  Hanging drywall was on the  critical path and was scheduled to begin on May 17, 2006.  Dr. Harmon calculated a 28-day delay due to late issuance of the West Tower building permit ("DEL1"), and a 51-day delay due to the late issuance of the East Tower building permit ("DEL2"). ¶¶334-335. Dr. Harmon also concluded that the delayed building permits delayed the sprinkler drawing approval process, resulting in an additional 120 day delay attributable to Delay 3 ("DEL3") and Delay 4 ("DEL4"). ¶¶336-337.  Comstock's expert agreed that if the building permit(s) had been issued earlier, the sprinkler drawings would have been earlier approved. ¶357.

### 2.      Comstock Directed BBC to Concentrate on the West Tower

Delays to East Tower completion were compounded by other events.  As early as March 2006, BBC was directed to concentrate its forces on the West Tower so Comstock could achieve closings by the end of 2006.  ¶¶88-96.  Warner confirmed in its monthly reports that work was redirected to the West Tower, and Mr. Strotman was well aware of the effect on the East Tower of the reallocation of resources. ¶96.  While Comstock sought to minimize the impact of this directive at trial, as if there were unlimited labor resources available to BBC at no additional cost, not a single contemporaneous document requested that BBC change this approach.

### C.     The Impact of CCB 46R Was Not Resolved by CO 15

One of the Project's most persistent and significant design issues was DCS's failure to comply with applicable requirements for accessible dwelling units, which Comstock contemporaneously referred to as a "debacle." At trial, BBC established that as early as October 20, 2004, the County raised issues regarding the compliance with accessibility requirements, and that such issues went unresolved by DCS and Comstock until April 28, 2006. ¶¶72-77, 117-118. Apparently lacking confidence in DCS, Comstock hired an ADA/FHA consultant in the spring of 2006 to review DCS's design.[5] Based on the consultant's report, Comstock directed DCS to redesign certain units in the spring of 2006 in order to comply with ADA and FHA requirements. Comstock and DCS issued CCB 46 to address the redesign, but thereafter further FHA issues were identified. CCB 46R, which finally resolved all of the FHA issues, was not issued until May 1, 2006, after the effective date of CO 15. Although a portion of the impact of CCB 46R was concurrent with, and subsumed by, delays tied to the building permits, CCB 46R is important in order to appreciate the design obstacles that BBC overcame, to explain some of the extended durations in the as-built schedule, and to understand CCB 46R's impact on BBC's ability to hang drywall, and fabricate and deliver kitchen cabinets and bathroom vanities.

Mr. Carey testified that CCB 46R was a "game-changer," while several other on-site personnel discussed numerous problems that the CCB caused, related to demolishing pipes, relocating risers, changing partition layouts, x-raying and core-drilling. CCB 46R required acceleration and extensive re-sequencing, and is indicative of Comstock's overall responsibility for Project delay. Moreover, the evidence regarding CCB 46R demonstrates that CCB 46R would have been an intervening and superseding cause of delay in obtaining sprinkler approvals.

_____

[5] The consultant's report was identified as privileged and concealed from BBC and DCS.

As Mr. Martin testified, unless "by some miracle everything" matches up when layout changes occur and walls have to be moved, "99.9 percent of the time," the sprinkler design must also change.   ¶176.   Comstock's changes under CCB 46R, which required layout changes and movement of walls, also affected Atlas's ability to finalize its sprinkler designs and obtain approvals of drawings it originally submitted in 2005. ¶128.

Comstock made no attempt to prove that CCB 46R was not a redesign requiring significant changed work.   Instead, Comstock suggested that the impacts of CCB 46R were resolved by CO 15.   Comstock's argument is without merit.   Virginia law is clear that a release will be enforced according to the parties' intention as expressed in the release.   Berczek v. Eric Ins. Group, 529 S.E.2d 89, 91 (Va. 2000) (citing Richfood, Inc. v. Jennings, 499 S.E.2d 272, 275 (Va. 1998)).   The unambiguous language of CO 15, releasing claims for delays incurred through April 30, 2006, could not be more express in *excluding* claims for delays arising out of CCB 46R, issued on May 1, 2006 and not received by BBC until May 2, 2006.   Comstock presented absolutely no proof that the impact of CCB 46R was covered by CO 15, providing only anecdotal and uncorroborated "evidence" that BBC "knew what was coming."   Indeed, Comstock's own contemporaneous documents indicate its belief that CCB 46R was not included in CO 15 and was "still out there" as of May 15, 2006. ¶¶151, 156-157.

### D.   Comstock Caused Additional Concurrent Delays

In addition to the delay impacts caused by the late issuance of building permits and elongated sprinkler drawing review, and the effects of CCB 46R, Comstock was responsible for several concurrent delays.   Comstock's concurrent delays demonstrate BBC's clear apportionment and allocation of delay to all known causes of delay, as is generally required in order to recover delay damages. See e.g., Techdyn, 427 S.E.2d at 337.

Dr. Harmon identified Delay 5 ("DEL5") as delays related to Project utilities that were Comstock's responsibility and were installed late. The most significant utility installation delay was Comstock's failure to timely install gas service, which affected BBC's work as neither the punchlist nor the testing/inspection of the hot water or heating systems could be completed without permanent gas service. ¶338. Comstock also admitted at trial that it failed to obtain telephone service, necessary to complete fire/life safety inspections, until just prior to obtaining the Core & Shell occupancy permit for the West Tower on November 20, 2006. ¶250. Comstock offered testimony regarding a haphazard "sort of a backup plan" to run telephone line to the Project "from across the street," but introduced no evidence that the County would have accepted such a plan for something as important as the final fire/life safety testing required to allow occupancy of the building. Comstock's failures with regard to its utility obligations are telling of its Project-wide inability to meet deadlines and perform its required obligations.

Other concurrent delays were analyzed and were also unrefuted by Comstock. Dr. Harmon identified Delay 7 ("DEL7") as the impact of the site work and landscaping changes due to CCB 64, which impacted the masonry work on both the Plaza and Level 2 courtyard areas for both Towers and was tied to the hardscape/landscape work activities inserted into the schedule. ¶¶342-343. Lastly, Dr. Harmon identified Delay 8 ("DEL8") as the impact of changes due to CCB 72, which required BBC to fabricate, ship and install new windows on East Tower floors 8-11.[6] ¶¶344-345. BBC's analysis of multiple concurrent delays, for which Comstock is responsible, indicates that BBC examined and allocated critical path delay properly. The details provided by Dr. Harmon, as well as the testimony elicited and Project documents introduced,

---

[6] Dr. Harmon concluded that if BBC had not accelerated or re-sequenced its work to mitigate the effects of all eight (8) of the identified delays, there may have been further non-concurrent delay.

establish causation and a proper allocation of delay to the degree of certainty required under Virginia law.

### E.    Comstock Ordered BBC to Accelerate

In addition to the quantifiable delays analyzed by Dr. Harmon, BBC proved that it was repeatedly directed to accelerate. On March 8, 2006, Comstock established its goal of settling as many units as possible in the West Tower in 2006. The undisputed evidence shows that Comstock's goal of revenue generation in fiscal year 2006, and meeting its company forecasts, was its foremost priority. ¶¶88-90, 92, 95, 215-220. Comstock directed BBC to concentrate its resources on the West Tower in order to complete as many West Tower units as possible, and refused to physically accept schedule updates that reflected delayed completion dates that did not support its revenue projections. ¶193. Comstock also continued to issue changes throughout 2006, 2007 and into 2008, yet *always* refused to grant time extensions for these changes.

BBC reserved its right to extensions of time in its proposal letters and submitted requests for time extensions. In response to Comstock's August 22, 2006 demand for a 30-day turnaround from hanging drywall to owner acceptance, BBC responded in writing, stating that the email was "clearly an order to accelerate." ¶203. Although Mr. Strotman recommended it be postponed, BBC submitted a formal acceleration claim in August 2006. As noted by Comstock's own scheduling consultant, BBC was diligent in notifying Comstock of the excusable delays, which along with Comstock's desire to meet its revenue projections, gave rise to Comstock's acceleration demands. ¶208. BBC complied with Comstock's clear directive to accelerate by adding personnel and working out-of-sequence in order to maximize the number of units it could complete for Comstock in 2006. While Comstock agreed to pay certain subcontractors' acceleration costs in order to achieve closings in 2006, inexplicably it refused to acknowledge

11

BBC's claim for acceleration. In accordance with Virginia law, BBC established that delays to its work were excusable, that Comstock ordered or forced acceleration, and that BBC in fact accelerated in order to close as many units as possible in 2006.

**F.   BBC Proved Its Damages Resulting from Comstock's Delay**

BBC proved its entitlement to recovery of delay and acceleration damages as discussed above. BBC also proved that it incurred resulting damages. BBC introduced detailed testimony from both Mr. Laib and Dr. Harmon regarding its damages, which were the direct result of Comstock-caused delays and directives to accelerate. With regard to delay damages, BBC calculated the precise cost of personnel on the Project site beyond February 15, 2007. ¶365-366. Dr. Harmon calculated these costs using data identified in BBC's job cost report, applying BBC's standard burden rate and including automobile allowances, to produce a total amount due for field supervisory labor cost. Dr. Harmon calculated several additional miscellaneous costs properly allocable to the extended duration of the job in the same detailed and reasonable manner. Dr. Harmon also calculated the exact cost of adding additional personnel to the Project due to acceleration, factoring in the exact date the person was added as well as the person's salary and duration of the person's stay on site. ¶367. All such costs were calculated using BBC's job cost report and contemporaneous records. ¶368.

Dr. Harmon recognized deductions for duplicative costs, subcontractor backcharges previously recovered, and costs paid by Comstock to BBC in change orders. ¶376-377. Dr. Harmon applied standard markups, including adjustments based on the causal connection between the delay or acceleration, and the actual costs incurred by BBC. In light of Dr. Harmon's analysis and calculations, supported by the testimony of Mr. Laib and the contemporaneous Project documents, BBC proved its claimed damages to a reasonable degree of

12

certainty and is entitled to $2,795,257.58 for delays, acceleration, and the contract balance.

## III.   COMSTOCK FAILED TO PROVE ENTITLEMENT AND DAMAGES

### A.   Comstock Did Not Prove Entitlement to Liquidated Damages

#### 1.   Comstock Did Not Even Attempt to Prove the Extent of Any Alleged Delay in its Case-in-Chief

As set forth in BBC's Motion for Judgment,[7] Comstock failed to present evidence establishing the cause and duration of the alleged delays as required by Virginia law in order to assess delay damages, liquidated and actual.  See Techdyn, 427 S.E.2d at 338-39. In order to recover liquidated damages, a plaintiff must "present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible." Id. at 337 (quotations omitted).   Comstock offered no evidence in this regard in its case-in-chief. Comstock failed to demonstrate that it was not responsible for any delays to the Project, including delays attributable to the late building permit, or the impact of CCB 46R.  Instead, Comstock *admitted* that a portion of the Project delays, including late issuance of building permits, were not the responsibility of BBC. ¶¶353, 355.

Comstock also failed to introduce any factual or expert evidence on the status of Owner Acceptance (the CO 15 milestone for imposition of liquidated damages) on a floor-by-floor basis and acknowledged that it raised no objection to the Owner Acceptance dates identified by BBC and inserted into the agreed schedule during the Project.  Comstock also acknowledged that the County withheld certificates of occupancy for issues such as Project artwork, which had nothing to do with BBC, but made no effort to apportion its claimed liquidated damages in this regard.

Comstock's entire liquidated damages claim is predicated on Mr. Benson's view of when

---

[7]BBC's Motion was filed September 11th and supplemented on September 14th.  It was renewed on September 16th at the conclusion of BBC's case-in-chief and again at the conclusion of trial.

all punchlist work on the entire Project would actually have been completed based on limited access.   While the trigger for imposing liquidated damages was changed from Substantial Completion to Owner Acceptance by CO 15, Comstock's substantial completion analysis is fatally flawed and unsupported by the Project Architect.  The Contract requires a determination on a floor-by-floor basis of, *inter alia*, when the punchlist associated with each floor would be "reasonably capable" of completion within thirty days as to only that floor.  There was no such evidence introduced by Comstock.  Comstock also made no allowance for its interference with BBC's orderly progression and access to the Work during the 2006 rush to close on units, or the continued disruption and lack of access resulting from Comstock's decision to prematurely occupy units on multiple floors at a time.

Finally, Comstock continues to take the untenable position that it is entitled to assess liquidated damages because DCS never issued a certificate of substantial completion.  The only logical measures of substantial completion, in light of Comstock's failure to adhere to the contractual process, are the County's issuance of TCOs/COs, Comstock's actual use and sale of the units and Comstock's own admissions that the Project was substantially complete.  Indeed, at trial, it was established that:

(1) TCOs and occupancy were achieved through the 9th Floor of the West Tower in 2006
(2) Comstock closed on 135 units by December 31, 2006, reflecting sales proceeds of $46 million
(3) East Tower TCOs/COs were obtained from May 2007 to July 2007
(4) Comstock sent letters to unit purchasers identifying the Project as substantially complete in July 2007
(5) Comstock publicly announced the Project's substantial completion to its shareholders
(6) DCS issued a letter in August 2007 certifying the Project as substantially complete

Comstock's attempt to recover liquidated damages under these circumstances must be rejected.  BBC is entitled to judgment in accordance with its Motion for Judgment.

14

2.      Comstock Conceded that any Delays Alleged to Have Been
        Caused by BBC Were Concurrent With the Building Permit
        and Resultant Sprinkler Drawing Delay

If there are delays caused by both parties which are concurrent, neither party can recover

delay damages. See Kerr Contracting Corp. v. Coen Co., 1992 WL 884566, at *11-13 (Va.Cir.

1992). Although it is BBC's position that it proved that Comstock caused the critical path delay

to the Project, Comstock's expert Mr. Anderson conceded that the Building Permit and resultant

sprinkler drawing delays were concurrent with any delays attributed to BBC. ¶364.  In such a

situation, Comstock cannot recover delay damages.

Neither expert analyzed delays after the completion of actual construction.  Mr. Anderson

testified that the "punchlist" could not be analyzed by forensic scheduling methods. ¶350.  Thus,

at a minimum, and by Comstock's admission, all delay through the construction period is

concurrent and no liquidated damages can be assessed.  Mr. Anderson also conceded that it is not

possible to allocate delay during the punchlist period. ¶350.  Comstock did not prove delay

damages.

**B.      Comstock Cannot Recover Liquidated Damages Because They
        Have No Relationship to any Loss Incurred by Comstock**

1.      Comstock's Assessment of Liquidated Damages on the West
        Tower After it Took Over Units is Improper as a Matter of Law

Comstock is not entitled to assess liquidated damages for the West Tower after it was

able to use and occupy the condominium units for their intended purpose, i.e., sales to third party

purchasers.  Liquidated damages that are designed to approximate loss to the owner before

occupancy become a penalty if imposed after the owner is able to use the project for the purpose

for which it was intended. Perini Corporation v. Greate Bay Hotel & Casino, Inc., 610 A.2d 364,

376 (NJ 1992) (abrogated on other grounds by Tretina Printing, Inc. v. Fitzpatrick & Assocs.,

Inc., 640 A.2d 788 (NJ 1994)).

Notably, Comstock provided no evidence that it actually sustained delay damages after it sold units to purchasers and, in fact, no such damages were incurred. BBC presented undisputed evidence that, beginning in October 2006, Comstock utilized the Project for its intended purpose, the sale of condominium units to third parties. An award of liquidated damages, despite the millions of dollars in revenue realized by Comstock in 2006 and 2007 and use of the Project for its intended purpose, would constitute a windfall for Comstock and an unlawful penalty.[8]

### 2.   Comstock Waived its Right to Assess Liquidated Damages on the East Tower

Comstock also waived its right to assess liquidated damages on the East Tower by demanding and agreeing to a revised schedule to complete the Work. In January and February 2007, Comstock demanded that BBC agree to a new schedule for the East Tower or face default termination. ¶¶278-281. BBC agreed to a revised schedule for the Work as demanded and Comstock sent BBC the "final Letter of Understanding" on March 6, 2006, incorporating the revised schedule but not mention liquidated damages. Comstock measured performance in accordance with this revised schedule, congratulating BBC for finishing early. At no time during the Project did Comstock impose or threaten to impose liquidated damages for the East Tower until a week before the Parties' July 2008 mediation. ¶¶282-283, 386. By establishing a new completion schedule, without communicating its intent to maintain the original schedule for purposes of assessing liquidated damages, the Owner is bound by the substituted schedule. C.H. Hyperbarics, Inc., ASBCA No. 49375, 04-1 BCA ¶ 32568. Under similar circumstances, the U. S. District Court for the District of Columbia held that liquidated damages were waived:

---

[8] BBC's position in this regard is supported by the general tenets of damages law in Virginia. See e.g., Younger v. Appalachian Power Co., 202 S.E.2d 866, 867 (Va. 1974) ("The general rule in awarding damages is to give compensation for the pecuniary loss – to make amends or reparations for the injury inflicted.")

[t]he Court does not believe that WMATA has established entitlement to liquidated damages for several reasons. First, WMATA's claim does not take into account the *new* milestone and project completion dates agreed to by the parties in the August 1989 Agreement. [WMATA] used original dates, which enhanced or inflated the appearance of delay.   The legal principle here is waiver: in agreeing to new milestone and project completion dates in the August 1989 Agreement, WMATA waived its right to recover liquidated damages for delays occurring prior to August 25, 1989.   Waiver of the right to assess liquidated damages is found when the government extends the contract completion date without 'manifesting its intention to maintain the original schedule for purposes of assessing liquidated damages.' " *D & S Roofing Co., Inc.*, 85-2 B.C.A. (CCH) ¶ 18114 (1985).   **"The government was found to have waived its right to assess liquidated damages when it prompted the contractor to submit revised completion dates which the government subsequently approved."** *LaGrow Corp.*, 91-2 B.C.A. (CCH) ¶ 23,945 (1991).

Mergentime Corp. v. Washington Metro. Area Trans.Auth., Civ. A. No. 89-1055, 1993 WL 328083 at 93-94 (D.D.C.)(finding it would also be unjust to allow recovery of liquidated damages after "beneficial occupancy") (emphasis added).

3.   Comstock Occupied the Project Without Following Contractual<br>Requirements and Cannot Recover Liquidated Damages

BBC proved at trial that Comstock actively interfered in the Project when it directed the sequence for performance of the work, took over the scheduling of work and derailed the planned punchlist process. Moreover, Comstock occupied the units while refusing to enter into an agreement with BBC, as required by Section 9.9.1 of the Contract, regarding warranties, the status of the work and other issues.   Section 8.1.4 states "[t]he Owner's exercise of its option *under the Contract* to use or occupy all or any portion of the work" does not toll liquidated damages "except that if such occupancy further delays Substantial Completion of the Work, *through no fault of the Contractor or its Subcontractors, the Contractor shall not be responsible for liquidated damages during the period of such additional delay.*"   (emphasis added). Comstock's option to occupy under the Contract required agreement under Section 9.9.1. While the punchlist was "reasonably capable" of completion within 30 days when the County issued the TCOs and COs, BBC presented unrefuted evidence at trial that Comstock's occupancy of the

units further affected BBC's ability to perform punchlist work. BBC further demonstrated that Comstock's premature start and mismanagement of the punchlist process disrupted and delayed BBC's planned punchlist performance. Thus, Comstock is barred from recovering liquidated damages per Section 8.1.4 of the Contract.

4.   Comstock Cannot Recover Liquidated Damages During the Same Period it Directed Changes

The undisputed facts demonstrate that Comstock continued to direct changes to the Work after the revised completion dates set forth in CO 15 and into 2008. Mr. Frew testified that Comstock's numerous change directives continued after the revised completion dates set forth in CO 15. ¶324. As a result, BBC remained on site and was forced to divert resources from other areas of the Project to perform the changed work.

Under Comstock's flawed logic, BBC would be required to pay $12,000 per day for the privilege of remaining on the Project to perform not only Contract work – resulting from Comstock's delay – but also additional work directed by Comstock after the revised completion dates. It would be inequitable for Comstock to recover liquidated damages during a period that BBC was performing newly directed work, regardless of whether liquidated damages would have otherwise accrued. See Appeal of Zisken Constr. Co., ASBCA NO. 8613, 1963 BCA ¶3820 (1963). For this reason, Comstock's claim for liquidated damages must be rejected.

**C.   Comstock Cannot Recover Actual or Liquidated Damages for Delay**

It is well settled under Virginia law that a party cannot recover duplicative damages.[9] See Wilkins v. Peninsula Motor Cars, Inc., 587 S.E.2d 581, 583 (Va. 2003). With respect to alleged breaches of construction contracts that contain liquidated damages provisions, liquidated damages are the proper measure of alleged delay damages. See Ranger Constr. Co. v. Prince

---

[9] BBC's MPSJ is incorporated by reference, as if fully set forth herein.

William County School Bd., 605 F.2d 1298, 1306 (4th Cir. 1979). Indeed, "the purpose of a liquidated damages provision is to obviate the need for the nonbreaching party to prove actual damages." O'Brian v. Langley School, 507 S.E.2d 363, 366 (Va. 1998). Comstock's attempt to recover duplicative damages for alleged delays is contrary to Virginia law. In the Contract, Comstock agreed that liquidated damages would be the sole remedy for delay. Nonetheless, Comstock claims "actual damages" for (1) financing costs, (2) extended personnel costs, (3) interest, and (4) Homeowner's Association ("HOA") costs and taxes. Damages of this nature are covered by Section 8.1.4 of the Contract and are, therefore, duplicative. In its Interrogatory Responses, Comstock specifically identified all of these costs as included within the coverage of its liquidated damages clause. ¶388. Mr. Benson also testified that the extended personnel costs constitute delay damages. ¶387. By including a liquidated damages provision in the Contract, Comstock waived its right to claim actual damages. By failing to prove its entitlement to liquidated damages, Comstock is precluded from recovering liquidated damages. Thus, it is not entitled to recover either actual or liquidated delay damages.

### D.     Comstock Cannot Recover Legal Fees and Costs

In its Opinion on the Parties' motions for summary judgment, the Court left open the possibility of Comstock's recovery of attorney's fees allegedly incurred to defend against BBC's mechanic's liens. The Court further stated that "[t]his finding does not mean that Comstock is automatically entitled to attorney's fees, however. To be entitled to attorney's fees, Comstock must prove at a later stage in this litigation that the fees were 'reasonable in the amount and reasonably incurred.'" Dkt No. 463. Comstock failed to meet this burden.

A party seeking to recover attorneys' fees must offer evidence to show that the amount sought is reasonable. See Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven Ltd. P'Ship, 480 S.E.2d 471 (Va. 1997). In Virginia, expert testimony is required to establish the

reasonableness of fees. <u>Mullins v. Richards Nat'l Bank</u>, 403 S.E.2d 334 (Va. 1991). Only in limited circumstances have Virginia courts waived this requirement. <u>See</u> <u>e.g.</u>, <u>Tazewell Oil Co. v. United Virginia Bank</u>, 413 S.E.2d 611 (Va. 1992) (waived only because the plaintiff provided 300 pages of detailed billing records and sworn affidavits from the attorneys); <u>Seyfarth</u>, 480 S.E.2d at 473 (waived only because the attorneys testified).

The only evidence presented by Comstock regarding its attorney's fees claim was the testimony of Bruce Labowitz, its former CFO. Mr. Labowitz's testimony was insufficient to establish the requisite burden under Virginia law. While Mr. Labowitz was able to identify the invoices that allegedly support Comstock's claim, he could not testify with certainty that those fees had even been paid by Comstock, calling into question the veracity of Comstock's actual damages. Moreover, Comstock did not offer an expert to testify as to the reasonableness of the fees, nor did it submit sworn affidavits or the testimony of the attorneys that allegedly provided services to Comstock during the lien action. Absent such proof, the Court cannot conclude that the fees were reasonable or properly incurred.

Moreover, Comstock failed to mitigate these damages. <u>See</u> <u>Forbes v. Rapp</u>, 611 S.E.2d 592, 595 (Va. 2005) (stating that the non-breaching party has a duty to mitigate). Indeed, as required by its loan agreement with KeyBank, Comstock could have filed a statutory lien bond during the pendency of the lien proceedings, eliminating the need for BBC to name third party defendants. At trial, Comstock admitted that a cost of $5,500, or one percent of the amount of the liens, was "not an unreasonable assessment" of what it would have cost to bond-off the liens. Had Comstock bonded off BBC's liens, third parties would never have been joined in the action.

Finally, in Virginia the cost of litigation between Comstock and BBC is *not* recoverable. <u>See</u> <u>Hiss v. Friedberg</u>, 112 S.E.2d 871, 876 (Va. 1960) (finding that the rule ***does not*** extend to

the cost of litigation between the plaintiff and defendant, only the cost *to maintain an action*

*against a third party or to defend an action by a third party*) (emphasis added).  Comstock is

not entitled to the fees that would have been incurred to defend against BBC's liens regardless of

whether third parties were present.  Comstock failed to apportion fees that would have been

incurred regardless of the presence of third parties from those incurred solely to "maintain an

action" with the third parties.  Moreover, Comstock was not required to make any claims against

third parties or defend any actions by third parties as required by Hiss.

### E.    Comstock Waived Claims for Consequential Damages

Consequential damages are not directly caused by a breach, but rather "arise from the

intervention of 'special circumstances' not ordinarily predictable[.]"  See R.K Chevrolet, Inc. v.

Hayden, 480 S.E.2d 477, 481 (Va. 1997).  Whether damages are direct or consequential is a

question of law for the court.[10]  Fairfax County Redevelopment and Housing Authority v. Hurst

and Assoc. Consulting Engineers, Inc., 343 S.E.2d 294 (Va. 1986).

In Section 4.3.11 of the Contract, Comstock waived its right to recover consequential

damages for "loss of financing."  See Contract, § 4.3.11; Dkt. No. 431 at 22-28.  Specifically,

Comstock seeks to recover financing costs that are expressly barred by the consequential

damages waiver provision in the Contract.  Comstock claims damages for bank fees in the

amount of $133,276 incurred when Comstock modified the Corus Bank loan.  Comstock asserts

that these fees were incurred as a result of Corus Bank's decision to discontinue financing for the

Project due to Corus Bank's concerns regarding the Atlas liens.  In order to avoid the loss of

financing, Comstock contends that it agreed to modify the Corus Bank loan pursuant to Corus

---

[10]Contractual waivers of consequential damages are enforceable in Virginia.  See Washington &
O.D. Ry. v. Westinghouse Elec. & Mfg. Co., 91 S.E. 646, 647 (Va. 1917).

Bank's terms, which included a $133,276 loan modification fee.  However, at trial, Comstock admitted under cross-examination that the loan modification fee was contained within the Corus Bank term sheet provided to Comstock prior to the Atlas lien filing. ¶¶419-420.  Such damages are not only consequential, but are speculative and specifically identified and waived by Comstock per the Contract.

Comstock further alleges that it is entitled to a $200,000 origination fee paid to Stonehenge, a lender controlled by Comstock's CEO, for a two week loan due to the loss of Corus Bank's financing.  Again, Comstock waived recovery of such losses of financing as a consequential damage per Section 4.3.11 of the Contract.  As Comstock presented no evidence that such damages were not consequential, its claim for damages for the Corus Bank loan modification fee of $133,276 and the loan origination fee of $200,000 is barred by the Contract.

Even if the Court finds that the loan modification fee and/or origination fee are not due to "loss of financing," the Court must find that these fees are barred.  Contract Section 4.3.11 waives any consequential damages arising out of or relating to the Contract, not just those enumerated.  The loan modification fee and origination fee are costs not directly caused, arising "naturally" or expected to result from a breach of the Contract.  For instance, according to Comstock, the loan modification fee was the consequence of Corus Bank's concerns regarding the Atlas liens.  Notably, Comstock did not present any witnesses from Corus Bank or KeyBank at the trial.  Corus Bank's concerns were a "special circumstance," not a breach of the Contract by BBC, and damages flowing from the intervention of a special circumstance are consequential.

Comstock claims $2,788,204 for refinancing Comstock's loan with KeyBank in the form of loan closing fees, interest on the closing fee, legal fees and closing costs.  Comstock's purported reason to refinance with KeyBank, however, was the result of a loss of Corus Bank's

22

financing.  Again, damages incurred by Comstock due to the loss of financing are consequential damages expressly waived by Comstock per the Contract.  Moreover, the KeyBank loan was a "revolving loan" that provided Comstock Homebuilding, Inc. with "cash-out" capital for operations, and also addressed the maturity and curtailment obligation of another loan that another Comstock entity held with KeyBank on *another* Project. ¶422.  Comstock cannot recover from BBC fees and costs for a loan that was used for multiple non-Project purposes.

Comstock's claim of $303,813 for interest, HOA costs and taxes for unit cancellations are consequential damages.  Comstock expressly waived as consequential damages any claims for "losses of income."  These claimed damages were allegedly incurred because Comstock lost income when unit purchasers cancelled their contracts.  Comstock, moreover, did not prove that unit cancellations were due to the liens and not due to other circumstances, such as a declining market.  Indeed, Comstock *admitted* that it did not know whether contracts were cancelled because of the liens, and that the condo market was in decline when the liens were filed. ¶¶349, 416.  Such damages are not only consequential, but speculative, and are barred by the Contract.

Finally, Comstock waived recovery of its purported additional and extended personnel costs in the amount of $1,128,863.49.  Section 4.3.11 states that Comstock waived, as consequential damages, "damages incurred … for the services of" management or employees.  Thus, Comstock waived damages for its overhead arising out of or relating to the Contract.

**F.    Comstock's Backcharges Are Barred by Prior Written Agreements**

Comstock's alleged backcharge claims are barred because they were settled between the Parties through prior written agreements.  Comstock and BBC entered into Owner Change Order 41 and 43 resolving all backcharges asserted by Comstock and known to BBC as of January 10, 2008 and April 28, 2008, respectively.  Settlement agreements are enforceable under Virginia law and preclude a party to the settlement agreement from later asserting claims covered by the

terms of the agreement.  See Brock v. Entre Computer Centers, Inc., 933 F.2d 1253, 1261 (4th Cir. 1991); United States v. Centex Constr. Co., Inc., 638 F. Supp. 411, 413 (W.D. Va. 1985). Consequently, Owner Change Orders 41 and 43 preclude Comstock's recovery of backcharges.

### G.     Comstock Failed to Comply with the Contract's Notice Provisions

Under Virginia law, Comstock's failure to comply with the Contract's notice and claim requirements is fatal to Comstock's backcharge and liquidated damages claims.  See Main v. Dept. of Highways, 142 S.E.2d 524, 529-31 (Va. 1965); Dkt. No. 431 at 31.  Comstock's liquidated damages claim is barred for failure to comply with the claim requirements of Sections 4.3.1 and 4.3.2 of the Contract.  It was conclusively established at trial that Comstock did not withhold liquidated damages from payments to BBC and did not assess liquidated damages against BBC until just prior to the Parties' mediation in July 2008.  It is also undisputed that Comstock failed to comply with the notice requirements set forth in Section 2.4.1 of the Contract, but for flooring repairs paid for by BBC via Change Order 43.  The only "evidence" proffered by Comstock that it provided notice were two (2) threatened default letters, neither of which constitutes a claim for liquidated damages or contractual notice of backcharges.  The January 31, 2007 letter contains no reference to liquidated damages and only _threatens_ to issue notice pursuant to Section 2.4.1 of the Contract.  No such notice was issued by Comstock.  The February 14, 2007 "draft default notice" letter did not constitute contractual notice, nor did it assess liquidated damages.  Instead, Comstock requested and BBC provided a "revised, appropriate completion schedule showing improved milestones for the East Tower … to which Centex will be held fully accountable."

### H.     Comstock Did Not Prove Its Entitlement to Any Warranty Damages

Comstock seeks to recover from BBC _future_ additional "estimated" costs of approximately $1.5 Million to correct "warranty" items.  Comstock cannot recover such

estimated future costs under the Contract. Comstock presented no evidence that it complied with the procedural and notice requirements for warranty claims per Section 15.3 of the Contract. Moreover, Section 15.5 of the Contract establishes BBC's "sole liability" with regard to warranty claims and limits Comstock's recovery to the *reasonable cost of repairs already made.*" Comstock only introduced as evidence a spreadsheet containing "warranty" items, without any evidence for many of these items explaining why they were attributed to BBC. Mr. Kidwell did not establish the reasonableness of any of the estimates claimed, nor did he adequately explain inconsistencies between the agreed-upon punchlist in the January 30th Agreement and warranty values for the same line items. Finally, Comstock *admitted* that this "warranty" work has not been performed and that no costs have been incurred. ¶¶391-403. Per Section 15.5 of the Contract, such claims are not recoverable.

BBC proved at trial that it took all reasonable steps to address warranty items such as scratched glass and cabinet repairs, before and after BBC demobilized due to Comstock's breach of its payment obligations. BBC returned to the Eclipse to perform work on leaking patios and units and testified that these issues were related to problems with the original design. ¶395-400. It is undisputed that BBC repeatedly attempted to make cabinet repairs, replace scratched glass and perform punchlist work in settled units for over twenty months. ¶¶240, 256-263, 402. BBC's well-documented efforts were stymied by Comstock's failure to provide BBC access to occupied units. Under such circumstances, Comstock's unsubstantiated warranty claims must be denied.

Dated: October 23, 2009        Respectfully submitted,

/s/ Shelly L. Ewald
_____

Shelly L. Ewald (VSB #31732)
John B. Tieder, Jr. (VSB # 12315)
WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
*Attorneys for Defendant/Counterclaim Plaintiff*
*Balfour Beatty Construction, LLC*
8405 Greensboro Drive, Suite 100
McLean, Virginia  22102
Telephone:  703-749-1000
Facsimile:  703-893-8029
sewald@wthf.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2009, a copy of the foregoing document will be electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the below-named Parties.

> Stephen M. Seeger
> Kristin E. Protas
> James J. Faughnan
> Quagliano & Seeger, P.C.
> 2620 P Street N.W.
> Washington, DC  20007
>
> *Attorneys for Plaintiff Comstock Potomac Yard, L.C.*
>
> /s/ Shelly Ewald
> Shelly Ewald (VSB #31732)
>      WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
> 8405 Greensboro Drive, Suite 100
> McLean, Virginia  22102
> Telephone:  703-749-1000
> Facsimile:  703-893-8029
> sewald@wthf.com