IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**



FILED
FEB 2 3 2010
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| COMSTOCK POTOMAC YARD, L.C, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 1:08-cv-894 |
| | ) |
| BALFOUR BEATTY CONSTRUCTION, LLC, | ) |
| | ) |
| Defendant. | ) |

## FINDINGS OF FACT

The Court begins its examination of the facts in earnest at the execution of CO15, which revised the interim milestones toward completion of the Project. The Court finds that each of the facts in the following paragraphs have been proven by a preponderance of the evidence.

1. On March 10, 2006, Balfour sent Comstock a Schedule Update, referred to as PY16, which covered a period through February 28, 2006, and showed that a number of milestones would not be met in time. CPY Ex. 116. Thereafter, Comstock requested an updated schedule, which was presented in the form of schedule PYR2. Tr. 110:2-8 CPY Ex. 122.

2. Schedule update PYR2 laid out the critical path to occupancy milestones. CPY Ex. 122.

3. However, two PYR2 schedules were actually produced. BB Ex. 4132; BB Ex. 1231.

4.  Balfour apparently gave one revision of PYR2 to Comstock ("PYR2") but another version of PYR2 was produced ("Modified PYR2"). PY18 was based on the Modified PYR2 schedule. BB Facts ¶ 330.

5.  In the original PYR2, the planned start date for hanging drywall on the second floor of the West Tower, identified as Activity ID 2W4070, was May 17, 2006. Tr. 1305:18-20; BB Ex. 1135 Tab 3, p. 26 of 51.

6.  In PY18, however, the planned start date for hanging drywall on the same level was June 6, 2006. Tr.1310:7-9; BB Ex. 1135, Tab 16, p. 26 of 51. Similarly, in the original PYR2, the planned start date for hanging drywall on the second floor of the East tower, Activity ID 2E4070, was June 13, 2006, but in PY18, it is reflected as June 28, 2006. Tr. 1319:14-24 (Harmon); BB Ex. 1135, Tab 16, p. 37-39 of 51.

7.  PYR2 shows the "critical path" to certain milestones, namely those which were essential to getting occupants into the building, and PYR2 was a so-called "zero float schedule," which meant each of the activities on the schedule was on the "critical path" to completion of the project. Tr. 1125:16-23.

8.  At this point, the "concrete work" was finished on the West Tower and almost complete on the East Tower, but installation of the building "skin" (the exterior metal studs, sheathing, water-proofing, masonry and windows) was in a less complete stage. CPY Exs. 91, 97.

9.  Because the updated schedule projected the Project's completion date almost two months after the Contract date for completion, Balfour and Comstock negotiated a

time extension in CO15 and Comstock paid an additional One Hundred Fifty-Five Thousand Dollars ($155,000) to Balfour. CPY Ex. 89-A; BB Ex. 511.

10. Comstock also paid Balfour Two Hundred Twenty-Five Thousand Dollars ($225,000) for additional Balfour staffing, off-hour County inspections, and selective overtime. CPY Ex. 89-A; BB Ex. 511.

11. The principal effect of CO15 was to modify and extend the date for the Project's Substantial Completion by sixty (60) calendar days to February 15, 2007. *Id.*

12. Though the parties dispute certain events surrounding the execution of CO15, it is clear to the Court from testimony and other evidence presented that the purpose of CO15 was to clear then-existing disputes between the parties and enable the project to proceed forward on a viable schedule. Tr. 117:1-7.

13. The flow chart attached to CO15 indicates that "Owner Acceptance" would follow the completion of punch list work and the issuance of Certificates of Occupancy, just as the Contract contemplated with "Substantial Completion."

14. CO15 did not, however, modify the Contract's procedures and requirements pertaining to Substantial Completion. Tr. 870:7-19.

15. Notably, an exclusion for delays associated with CCB46 was not included in the final version of CO15. Tr. 648:1 – 649:6.

16. CO15 became effective on May 25, 2006 and was signed by Comstock on May 31, 2006 and by Balfour on June 1, 2006. CPY Ex. 89-A; BB Ex. 511. Further, CO15 provided that, to satisfy the updated dates, "all facilities, systems and improvements required for occupancy must be in place per Article 8 of the General Conditions, and a Certificate of Occupancy must have been issued by Arlington County." CPY Ex. 89-A, ¶ 2(b); BB Ex. 511, ¶ 2(b).

17. By May 10, 2006, the next schedule update submitted by Balfour, PY18, showed a three-and-a-half week delay to the hanging of drywall.

18. According to PY18, Balfour was 14 to 18 days behind schedule for the milestones set for the West Tower and 6 to 16 days behind schedule for the interim milestones for the East Tower. BB Ex. 486; Tr. 1545:17-22; Tr. 1550:22 – 1551:3; CPY Ex. 101.

19. The next schedule update, PY19, was issued on May 30, 2009, and indicated that, while progress on the West Tower lost no time, there was a loss of one week on the East Tower between PY18 and PY19. Tr. 194:1-4; CPY Ex. 91. This was because Balfour focused its efforts on the West Tower alone, rather than also attempting to make progress on the East Tower concurrently. Tr. 194:4-9.

20. In June, 2006, it became apparent that Balfour recognized the recurrent delays to the schedule plaguing the project, in large part because of the failings of its subcontractors, such as Atlas and Fairfax Glass Company. CPY Ex. 554.

21. At this point Comstock reiterated the importance of adhering to the schedule assured by CO15 and offered to supplement Balfour's subcontractor workforce. CPY. 149l Tr.126:6-127:2.

22. Comstock did not, however, issue an "acceleration" order under the contract or offer additional funds to Balfour. *Id.*

23. In early September, in response to Balfour's complaints that work on the Project was delayed because of delay in securing the Building Permits (in addition to several CCBs issued following CO15), Comstock reiterated its belief that Balfour remained obliged to meet the schedule as provided in CO15 and that a specific

procedure must be followed before a revision to that schedule is permitted under the Contract. BB Ex. 656. The Court finds that Balfour failed to follow that procedure.

24. Telling of the delays and failure to follow procedure which occurred throughout the Project's construction, Balfour never submitted an actual punchlist or comprehensive list of items to be completed to DCS for the Project or any portion of the Project and DCS never received a request from Balfour to certify Substantial Completion for the Project. Tr. 544:4-6.; Tr. 1405:2-5.

25. Comstock, not Balfour, prepared a "draft" certificate of substantial completion for the West Tower Core and Shell, to which Balfour subsequently failed to respond. Tr. 284:2 – 287:7; CPY Ex. 170; Tr. 1392:20 – 1393:3.

26. Rather, DCS sent a letter directly to Comstock indicating that "to the best of [the architect's] knowledge, the project is substantially complete on August 29, 2007" in an apparent effort to facilitate progress with Harris Teeter, one of the Project's tenants. Tr. 1399:9-23. DCS, however, never formally certified Substantial Completion for the Project. Tr. 551:5-13; Tr. 1392:17 – 1393:3; Tr. 1405:2-5.

27. Comstock subsequently denied Balfour's September 25, 2007 request for an establishment of Substantial Completion dates. Tr. 676:13 – 677:5; CPY Ex. 194.

28. The Court heard testimony from Dr. Kathleen Harmon, the expert retained by Balfour to testify in this case. Balfour has similarly retained Dr. Harmon on a number of prior occasions. Tr.1267:16-17; Tr. 1380:14-16; Tr. 1267:18-1268:8.[1]

---

[1] While the Court does not discredit Dr. Harmon's testimony on this basis, the Court does note that Dr. Harmon has derived a significant portion of her income from Balfour since 2004 and was engaged by Balfour on two additional cases at the date of this trial.

29. Dr. Harmon attributed a significant number of the Project's delays to the late approval of the Building Permits. Harmon assigned twenty-eight (28) calendar days of delay to the late approval of the West Tower Building Permit and fifty-one (51) calendar days of delay to the late approval of the East Tower Building Permit. BB Ex. 1135. Harmon attributed the entirety of these periods of delay solely to Comstock. Tr. 1278:17-1279:2 ; BB Ex. 1135; Tr. 1279:8-25.

30. The extent to which late acquisition of the building permit actually delayed the Project was one of the most contested issues during the trial. On this point, the Court is persuaded that, whatever the "standard" practice in Arlington County may be, construction was permitted to proceed above street level prior to the issuance of the Building Permits on the Project, and acquisition of the permits was not the driving force behind the Project's delays, as Dr. Harmon represents. Tr. 260:1-8.

31. The testimony of Arlington County official James D. Martin ("Martin") enforced that point. Martin testified that the Arlington County Pre-Design Manual provides general procedures but that he does not follow it. Tr. 526:9 – 527:6. Accordingly, the Court is not persuaded that the Manual's provisions relating to the issuance of a Building Permit are conclusive, or even particularly persuasive, as to the Building Permit's impact on the Project's schedule.

32. Further, Balfour and its subcontractors did receive trade permits before the Building Permit, which persuades the Court that the practice in Arlington County at the time of the Project's construction was that trade permits could be issued

prior to Building Permit's issuance. Tr. 360:11-14; Tr. 433:7-8; BB Ex. 1135; CPY Ex. 230; Tr. 324:16-20.

33. Harmon notes that the Sprinkler Permit was dependent on the Building Permits, and the absence of the Sprinkler Permits prevented Balfour's subcontractors from obtaining close-in inspection approvals and hanging drywall. BB Ex. 1135. 106. She further conceded that the absence of the Building Permit did not inhibit or delay issuance of other trade permits or the performance of necessary rough-in work up until wall close-in. Tr. 1341:12-1342:4; 1358:7-10; 1608:13-15.

34. The East Tower Fire Sprinkler Permit was issued on February 2, 2007. B.B. Ex. 1135. Balfour obtained Hydro inspection approvals on the East Tower prior to the issuance of the East Tower Fire Sprinkler Permit.

35. Further, Comstock provided additional funding under the schedule improvement provision of CO15 for additional manpower for drywall installation. Tr. 119:15 – 120:10. Thus, to the extent that the delay in acquiring the Building Permits impacted the Project's progress, Comstock's efforts mitigated that impact, which Dr. Harmon failed to account for. Tr. 1540:20-23; CPY Ex. 101; Tr. 1317:14-17.

36. Dan Strotman's testimony indicated "there was the possibility that the building permit delayed [Balfour] in some respects." Tr. 362:21-23. Strotman further stated that "it's possible that there were two to three to maybe four weeks of time that they could have been hanging drywall if they had a building permit in some areas. Not all areas, but in some." Tr. 379:22 – 380:1-4.

37. Nonetheless, the balance of the evidence suggests that Balfour's delay in hanging drywall is not properly attributed to Comstock's delay in securing the Building

Permits. Balfour's attempts to link the delay in securing the Building Permits to the massive delays in getting the fire sprinkler designs approved, which in turn supposedly held up the hanging of drywall, likewise ultimately proved unpersuasive.

38. On the fifth floor of the West Tower, both the plumbing and gas close-in inspections were not approved until August 25, 2006, after the fifth floor "Hydro" passed, and on the sixth through eleventh floors of the West Tower, the last trade to get close-in approval was the electrical trade. Tr. 289:10-21; 290:2-11; BB Ex. 1135. Further, on the eighth through tenth floors of the West Tower, mechanical, plumbing and gas close-in approvals occurred concurrently with or after "Hydro" test approvals. Tr. 289:10-21; BB Ex. 1135; Tr. 290:12-15; BB Ex. 1135. The same can be said for the upper floors of the East Tower. Tr. 290:16-20; BB Ex. 1135.

39. As to the fire sprinkler permits themselves, blame for the failure to obtain sprinkler permits in a timely manner falls on Atlas. The Court is persuaded that the County did not refuse to review Atlas' fire sprinkler drawings and calculations due to the fact that Comstock had yet to secure the West Tower Building Permit. Tr. 511:11 – 512:3. While Mr. Martin had difficulty remembering every nuance of his involvement with the Project, it was clear to the Court that Mr. Martin was willing to work with Atlas in getting the fire sprinkler drawings approved on an efficient basis.

40. The delay in approval of Atlas' designs was attributable to the designs' quality, or lack thereof. Tr. 511:11 – 512:3. Emblematic of these failings was the conflict

between the size of the water lines indicated in the civil and plumbing drawings for the sprinkler plan. CPY Ex. 408, 409. Despite having the civil plans since 2004, which indicated a 6-inch fire main and a 4-inch domestic water main, Atlas' design of the system used an 8-inch fire main and a 6-inch domestic main. Tr. 268:21-270:16; CPY Ex. 411.

41. This design discrepancy caused a number of issues, involving a number of discussions and meetings between Atals and Balfour. Further, Atlas was forced to hire a fire protection consultant in April of 2006 Mr. Eric Rice-Johnston to revise the sprinkler calculations. CPY Ex. 417. Mr. Rice-Johnston's reexamination of the system was time consuming and even required new fire hydrant flow tests Further, in evaluating and re-calculating the design, Mr. Rice-Johnston uncovered further errors in Atlas' design, namely a non-compliant piping configuration. CPY Ex. 425.

42. Difficulties in getting the sprinkler plans approved by Arlington County were commonplace from March through August of 2006. CPY Ex. 267; BB Ex. 1135. In fact, Balfour acknowledged that these issues were "delaying the project." CPY Ex. 449.

43. Dr. Harmon tied the delays of the issuance of the East Tower Sprinkler Permit to the East Tower Building Permit, and assigned one-hundred twenty (120) days of delay wholly to Comstock. BB Ex. 1135. Atlas, however, made East Tower sprinkler submissions in December 2005 and in August and September 2006. CPY Ex. 498; BB Ex. 1135.

44. The County issued the East Tower Building Permit on September 22, 2006. Tr. 811;18-21. The County did not approve the last of Atlas' sprinkler drawing submissions until March 6, 2007, over five months after the East Tower Building Permit was issued. CPY Ex. 498.

45. Atlas' East Tower sprinkler design submissions were denied time and time again from December 2006 through February 2007. BB Ex. 1135; CPY Ex. 493.

46. While J.D. Martin gave some indication during his testimony that often drawings will be reviewed on a "one building at a time" basis, it was apparent to the Court that the County (and Martin himself) was flexible in its approach to reviewing submissions as needed to facilitate the Project's progress. Tr. 514:24-515:8.

47. Martin rejected Atlas' plans not because of the absence of a building permit, but because they were not code-compliant. Tr. 517:18-20.

48. On the sixth through eleventh floors West Tower, the last trade to get close-in approval was the electrical trade, while on floors eight through ten of the West Tower, mechanical, plumbing and gas close-in approvals occurred simultaneous or after receipt of the Hydro test approvals. Tr. 290: 2-15; BB Ex. 1135, Tab 14.

49. Like the West Tower, on the upper levels of the East Tower, the plumbing and gas trades were the last to obtain close-in approval. Tr. 290:16-20; BB Ex. 1135, Tab 14.

50. Atlas' performance was similarly deficient in securing successful "Hydro" tests of the sprinkler systems. CPY Ex. 487.

51. Without approved fire sprinkler drawings and calculations, Atlas could not get the necessary Hydros from the County in order to hang drywall. Tr. 274:9-22; Tr. 513:13-18.

52. Testing of the East Tower sprinkler heads revealed that over fifty percent of the heads were essentially clogged with glue. Tr. 414:17-22. Accordingly, every sprinkler head in the East Tower had to be pulled out and inspected. Tr. 415:13-16.

53. One of the most compelling pieces of evidence received by the Court was the December 2007 assertion by Balfour against Atlas that the Project was delayed significantly because of Atlas' failure to secure the fire sprinkler permits. CPY Exs. 15, 111; Tr. 1252:21-1253:1. Atlas ultimately agreed to pay $200,000 to Balfour for the delays occurring between February 7, 2007 and July 30, 2007, which Dr. Harmon acknowledged.

54. Dr. Harmon failed to credit that period of delay which Balfour ascribed as Atlas' fault in her calculations, and instead continued to find Comstock responsible for that period of delay

55. Dr. Harmon's attribution of delays to CCB 46R is equally unpersuasive to the court.

56. DCS issued CCB 46, a bulletin detailing needed revisions based on Americans with Disabilities Act and Fair Housing Act compliance, on March 29, 2006, before CO15, which covered through April 30, 2006. Tr. 290:21-291:13.

57. DCS then issued CCB 46R, which pertained, in large part, to changes to the cabinetry used in the Project, on May 1, 2006. Based on testimony, the Court

finds that CCB 46R supplemented, but did not replace, CCB 46. Tr. 343:23-344:2.

58. Balfour and Comstock both traveled to Kansas City to meet with CA International, Inc. ("CAI") on April 25, 2006. CPY Ex. 335. Comstock, DCS and Balfour met with CAI over the course of two days, going over the layouts of the individual condominium units. Tr. 296:2 – 297:5; Tr. 571:13-18.

59. Thus, Balfour was apprised of the information contained in CCB 46R before the April 30, 2006 execution of CO15.

60. The relocation of "risers" and "core drilling" were two of the central activities necessitated by CCB 46. This also involved moving pipes and changing partition layouts.

61. From testimony and evidence received, the Court is persuaded that, similar to the deficiencies discussed above pertaining to the sprinkler designs, Atlas' performance in completing the core drilling slowed the project, and Balfour acknowledged as much. CPY. Exs. 262, 359 360.

62. Atlas' performance occurred at inexplicably varying speeds from floor to floor. Tr. 1615:1-13. Similarly, though CCB 46R required a change in plans for the cabinet drawings and manufacturing, and thus, a corresponding increase in workload to accomplish these changes, the Court is persuaded that Comstock alleviated the impact of those changes with its efforts to meet the manufacturer's final color selection schedule and to deliver the cabinets pursuant to Balfour's schedule by expediting the shipments of those cabinets. Tr. 119:5-120:10.

Because delivery was ultimately unaffected, CCB46R did not impact or delay the PYR2/PY18 schedule.

63. As evidenced by the foregoing discussion of Atlas' performance with the sprinkler system drawings, the work relating to hanging drywall, and meeting the mandates of CCB46 and 46R, Atlas' performance throughout the Project generally appeared inadequate to the Court.

64. Further, after reviewing some of the Balfour schedule updates, including PY19, Warner Construction Consultants, Inc., Comstock's scheduling consultant, concluded that the Project was further delayed because of Balfour's illogical tying of the completion of the West Tower as a precursor to progressing on the East tower, though there was no actual reason not to work on the towers simultaneously. Tr. 193:15-25; CPY Exs. 91, 92.

65. Construction on the skin proceeded at a delayed pace, which impacted the issuance of the Core and Shell Occupancy Certificate. Tr. 1556:10-19.

66. The Temporary Certificate of Occupancy for the condominium units was dependent on obtaining the Core and Shell Occupancy Certificate. (Tr. 129:23 – 130:12; 279:15 – 280: 2; Tr. 1556:24 – 1557:3.

67. Balfour's delays in completing the work up to the eleventh floor of the West Tower caused the late receipt of the Core and Shell Occupancy Certificate. Tr. 1557:2-6.

68. The County issued a Core and Shell Occupancy Certificate on November 20, 2006. The Temporary Certificates of Occupancy for floors two and three of the West Tower were received the same day. Tr. 365:11-14; 821:10-13.

69. As of December 1, 2006, the County had issued Temporary Certificates of Occupancy for the second through fifth floors of the West Tower. B.B. Ex. 777.

70. On January 13, 2007, Comstock sent a letter to Balfour, threatening default termination of the Contract due to recurring delays and unacceptable performance. B.B. Ex. 825.

71. Atlas not only worked at a delayed pace, but also caused a great deal of damage to the Project and materials being stored there. Atlas' plumbing installation required whole counter-tops to be replaced.

72. A series of floods and leaks caused by Atlas damaged work-in-place and stored materials. Tr.1002:10 – 1004:6, 1005:22 – 1006:5, 1013:14-21, 1014:21 – 1015:6, 1017:10-21, 1017:22 – 1020:1; CPY Exs. 262, 265, 279, 281, 287, 291.

73. Atlas also installed a grease duct for the grocery store tenant, Harris Teeter, with its clean-outs incorrectly located in a condominium unit owner's kitchen. Tr. 395:11 – 396:8.

74. In addition to the above-mentioned problems with glue in the sprinkler heads, Atlas' design and installation of the HVAC units in the condominium units was also problematic. In order to rectify those issues, Atlas had to enter into occupied units to install new clips on pipes and had to cut holes through the sheetrock to access the pipes. Tr. 420:10-14. Balfour had to leave the ceilings open for several days and then the ceilings had to be patched and repainted. *Id.*

75. Installation of the cabinets was also slow and inconsistent, which impacted other work on the Project such as installation of plumbing fixtures and appliances. Tr. 656:21 – 657:22.

76. Balfour and its subcontrators' performance of so-called "finish work" was equally deficient.

77. "Finish work" consisted of those activities that followed the hanging of dry wall that were necessary to finalize the individual condominium units and prepare them for occupancy. Tr. 302:24-25.

78. In particular, window subcontractor Fairfax Glass Company ("Fairfax Glass") was particularly problematic for Balfour, causing Balfour to send Fairfax Glass a Notice of Delay and Damages on September 5, 2006. CPY Ex. 568. Balfour also considered supplementing Fairfax Glass' workforce to aid progress. CPY Ex. 569.

79. CA International, Inc. also exhibited problems in installing cabinets in a timely manner, which appears to have stemmed from insufficient manpower at the site. Tr. 655:5-13, 656:10-20.

80. A central part of preparing the units for occupancy involved Balfour preparing a list of items to be completed or corrected prior to final payment, and Comstock and DCS would then inspect the work and prepare a list of items to be completed. CPY Ex. 82.

81. Comstock argued that Balfour never created a punchlist. Comstock provided Balfour these "punchlists" for units on a floor-by-floor basis. CPY Ex. 205.

82. The "Lien Free Completion Agreement" updated and memorialized a number of items on these punchlists that had yet to be completed. CPY Ex. 57. Balfour, however, failed to produce these lists.

83. In early October, 2006, Balfour and Comstock agreed to perform what the parties referred to as a "mock-up punchlist" on selected units. Tr. 652:2-13.

84. On October 6, 2006, Balfour and Comstock met to identify what tasks should go on these punchlists. Tr. 652:2-13; BB. Ex. 714.

85. The parties agreed on the mock-up deficiencies and agreed to return to see how Balfour completed the punchlist for those units, but Balfour did not complete the punchlist in the mock-up units. Tr. 652:20-22.

86. As a result of Balfour's failure to complete punchlist work, Comstock compiled the lists itself and hired external personnel to assist in creating and inspecting the punchlists, including Owens Corning and Warner Construction Consultants, in addition to paying DCS to prepare a common areas punchlist. Tr. 595:20 – 596:21; 632:11-20; 631:4-11; CPY Exs. 232, 377.

87. The lack of utility services, such as natural gas, did not contribute to delays on the Project. The Court heard no credible evidence that had the gas service been provided earlier, it could have promptly completed punchout work on time.

88. Similarly, the Court did not hear any credible evidence regarding the impacts of CCBs 64 and 72, and thus does not find them to be a contributing factor in delaying the Project.

89. Because Comstock felt that the punchlists were Balfour's responsibility, Comstock informed Balfour that it would backcharge Balfour for the costs that flowed from Balfour's failure to meet that responsibility. CPY Ex. 185.

90. Balfour's subcontractors did not provide crews dedicated to punchlist work, and instead reallocated men performing production work to complete punchlist work. Tr. 454:13 –455:15; Tr. 1205:25 – 1206:10.

91. The unit purchasers were forced to re-walk their units multiple times because of the delayed and inconsistent manner in which the punchlist work was completed. Tr. 659:22 – 660:1.

92. David Laib, Balfour's Senior Vice President, ordered his crews to "slow down and get it right." BB Ex. 780.

93. In September of 2008, DCS recognized the deficiencies in Balfour's punchlist work and wrote to Comstock, advising that "we feel that there is a substantial amount of punch-list work that is yet to be completed." and that, because Balfour failed to do so, "[DCS] have been creating and are still in the process of creating punch-lists for the project." CPY Ex. 190.

94. Comstock also began directly supplementing Balfour's workforce. Tr. 660:9 – 661:5; Tr. 469:25 – 470:7.

95. Comstock paid Construction Applicators, Quintilla Construction, to aid with finishing punchlist labor such as painting, hanging drywall, adjustments, and minor installations, in addition to Production Cleaning Services to clean the units for unit purchaser walk-throughs because Balfour was not doing so. Tr. 473:1-7; Tr. 593:11-13; Tr. 593:20 – 594:5; CPY Ex. 232. In doing so, Comstock paid some $1,835,120.73. CPY Ex. 232.

96. The total cost incurred by Comstock for all of this work was $1,835,120.73. *Id.*

97. Additionally, Comstock added further personnel and resources to the Project as a result of Balfour's incomplete work. CPY Ex. 233. Comstock also hired additional contractors for security and punchlist work. *Id.*

98. Comstock's costs for these additional expenses were $492,479.13 in additional on-site supervision and $636,384.36 for third party security and punchlist work. CPY Ex. 233.

99. Comstock sent a number of communications to Balfour indicating its belief that Balfour had failed to perform adequately in completing its obligations, including a February 14, 2007 letter, which indicated that Comstock believed Balfour failed to meet all interim milestones set forth in CO 15. CPY Ex. 844.

100. On August 10, 2007, Comstock issued an additional "Notice" in which Comstock stated that Balfour must "commence and continue corrective repairs and warranty work to the flooring at the Project." Tr. 667:9-23; CPY Ex. 183.

101. On June 19, 2008, Comstock sent Balfour another letter indicating that Balfour had still not completed certain items and again notifying Balfour that Comstock was correcting this unfinished or inadequate work. Tr. 677:6-22; CPY Ex. 213.

102. On December 14, 2007, Atlas filed two mechanic's liens on the Project because it had not been paid by Balfour since July 2007. Tr. 1256:19-24; Dkt. No. 296.

103. At this time, Comstock had paid Balfour for Atlas' work at the Project. Tr. 66:12-14. Balfour did not work to remove the Atlas liens within five days of the liens' filing. (Tr. 66:16-18 (Labovitz); CPY Ex. 82.

104. On December 28, 2007, Comstock wrote to Balfour, demanding it bond off Atlas's lien. CPY Ex. 6. Balfour did not do so. Tr. 66:16-18; CPY Ex. 82.

105. On February 14, 2007, Comstock sent Balfour a draft notice of default. Tr. 664:2-9; BB Ex. 844.

106. As a result of that letter and the conflict between the parties at that point in time, the parties met on February 14, 2007 in an attempt to resolve their apparent differences. BB Ex. 861.

107. A "Letter of Understanding" dated February 25, 2007 was subsequently produced. *Id.*[2] The letter indicated that the parties "would endeavor to come up with mutually agreeable goals and the process for schedule improvement," but also noted that the parties "could not come to an agreement as to the cause, responsibility, fees, damages and/or a succinct timeline for completion of the project." *Id.* David Laib acknowledged that the letter "was not a formal modification to the contract." Tr. 878:5-9.

108. The Atlas liens affected Comstock's ability to receive further financing or extend its lending relationships with its then-lender, Corus Bank. Tr. 66:23 – 67:10; 87:10 – 88:8. This forced Comstock to seek alternate financing. Tr. 67:8-13. Thus, Comstock entered into an amended agreement with Corus on January 31, 2008 in order to provide for completion of the Project. In doing so, Comstock paid a "Modification Fee" of $133,276.64. Tr. 67:16 – 68:23; CPY Ex. 248.

109. In February 2008, Comstock received further financing from Stonehenge Funding, LLC ("Stonehenge") in order to fund expenses associated with the Project not covered by the Corus loan. Tr. 70:2-21; CPY Ex. 249. In receiving this loan, Comstock paid a transaction fee of $200,000. Tr. 71:5-11; CPY Ex. 239.

---

[2] The Letter of Understanding marked as BB Ex. 861, shows a drafting date of February 25, 2007, though it was emailed as an attachment on March 6, 2007. The parties seem to date the letter as either: March 6, 2007, March 6, 2006, or February 25, 2007, but for ease, the Court will identify the latter as the February 25, 2007 Letter of Understanding.

110. Comstock also sought additional funding from KeyBank. Tr.72:8 – 73:5; CPY Exs. 251, 252. Comstock incurred both an "up-front loan commitment fee" of $734,385 and a loan origination fee in the amount of $2,937,542. Tr. 74:7 –75:18; CPY Exs. 251, 252.[3] Then, as part of the payoff of the Corus loan, Comstock incurred $8,844.92 in legal fees. Tr. 77:20 – 78:16; CPY Ex. 250.

111. Comstock also suffered losses in sales on the Project condominium units. Comstock lost eight sales contracts during the period of time that the Balfour liens and Atlas liens were on the Project in the total amount of $2,885,419, in addition to interest of eight percent (8%) on the outstanding balances under the loan, or $225,273.00. Tr. 64:17-22; 65:8-20; Tr. 62:16 – 64:16; 65:4-7; CPY Ex. 253. Comstock also paid homeowner's fees for the units they did not sell totaling $49,980.00. Tr. 65:21 – 66:2. Comstock further paid real estate taxes associated with ownership of those units totaling $28,560.00. Tr. 64:17 – 65:1.

112. Seeking to resolve some of their differences arising out of the filing of the Atlas liens, on January 30, 2008, Comstock and Balfour entered into the "Lien Free Completion Agreement." In doing so, Comstock stated that it only settled certain backcharges and reserved its right to other remaining claims against Balfour. Tr. 742: 4-10; CPY Ex. 57.

113. In the Agreement, Balfour also agreed that as of January 10, 2008, there was still $802,295 worth of items to be completed on the Project's punchlists. Tr. 1483:11-22; CPY Ex. 57.

---

[3] Comstock allocated 72% of these two costs, or $530,520.00 and $2,122,520.00, respectively. Tr. 76:10 – 77:19; CPY Exs. 251, 252.

114. After reaching the Agreement, the parties set out to finish the remaining work on the Project, though Balfour's level of work on the remaining punchlist work mirrored the quality of its prior work on the Project.

115. Among the problems which Balfour failed to correct were scratches to exterior windows glass that occurred when the mason spilled mortar onto many of the windows in the West Tower, causing scratches to the glass when the mortar was removed. Tr. 1488:8 – 1491:15; CPY Ex. 579. Some sixty pieces of glass still need to be replaced today. Tr. 620:18-24.

116. Further, a great deal of damage remained due to poor cabinet installation and CAI essentially abandoned the Project in August 2007. CAI Depo. 87:21 – 88:10. Balfour acknowledged the extent of CAI's deficient performance in a January 21, 2009 notice of default sent to CAI, in which Balfour referenced a punchlist valued at $307,550 for corrective work associated with the cabinets.. CAI Depo. 51:11-19; CAI Ex. 7.

117. On August 29, 2008, Balfour ceased working on the Project. BB Ex. 1118. The Court is persuaded that at that point in time, there were still items remaining uncompleted by Balfour on the punchlists. Tr. 1483:8-10.  This amounted to $248,145 worth of outstanding work.  Tr. 605:1-13; CPY Ex. 234.

118. Comstock also kept a tally of deficiencies and costs which were not incorporated into the Lien Free Completion punchlist, which it identified as "warranty items." As of November 2008,  $1,260,502 worth of these "warranty items" remained outstanding. Tr. 605:22 – 606:2; CPY Ex. 234.

119. On July 29, 2008, Balfour filed two mechanic's liens on the Project.  The first

was in the amount of $330,610 and was filed for "retainage" on adjusted contract amounts not subject to prior liens. Dkt. no. 376, p. 8. The second was in the amount of $221,566 and was ostensibly for "extended delay costs on adjusted contract amounts not subject to prior liens." *Id.*

120. At this point, Comstock received phone calls and other correspondence which imparted concerns from title companies, the unit owners' association, and individual unit owners regarding the liens. Tr. 685:11-25 ; Tr. 48:10-16.

121. As a result of the filing of these liens, Comstock retained counsel to defend itself and third parties against the liens. Tr. 47:18-23.

122. In particular, Comstock received invoices from: Quagliano & Seeger, P.C. for $114,859.51; McKenna Long & Aldridge, who represented KeyBank, one of the Project's lenders, for $43,811.20; McGuire Woods, who also represented KeyBank, for $396.00; Miles & Stockbridge, P.C., who were retained by the title insurance company that represented both Corus and KeyBank, for $78,213.29; and Debra Fitzgerald-O'Connell P.C., who represented the individual condominium owners, for $23,880.47. CPY Ex. 240-44.

123. Former Comstock CFO Bruce Labovitz also testified that approximately $6,020 of Quagliano & Seeger's fees related to the two claims dismissed by this Court on summary judgment. Tr. 52:2 – 53:18.

124. The Court finds that the incurring of these fees was the direct result of Balfour's breach of the LFCA.

125. As of December 31, 2006 Comstock's profits from the sale of individual

condominium units totaled approximately $46 million. BB. Ex. 1209; Tr. 679:4-

21.

126. At the time of trial, there were eighty-three unsold condominium units at the

Project. BB. Ex. 1209; Tr. 679:4-21.

/s/

Liam O'Grady
United States District Judge
2|23|10